## COMMONWEALTH vs. JOHN GOMES.

Suffolk. January 7, 2011. - March 31, 2011.

Present: IRELAND, C.J., SPINA, COWIN, CORDY, & GANTS, JJ.

*Jury and Jurors. Practice, Criminal,* View, Jury and jurors, Conduct of prosecutor, Instructions to jury, Argument by prosecutor, Assistance of counsel, Capital case. *Constitutional Law,* Fair trial, Assistance of counsel. *Evidence,* Cumulative evidence, Expert opinion. *Judge. Privacy.*

At a murder trial, no substantial likelihood of a miscarriage of justice arose during a view when the prosecutor asked the jury, who were standing where eyewitnesses had been positioned at the time of the crime, if they could recognize his features as he stood where the defendant allegedly shot the victim, where the prosecutor, although essentially conducting an unauthorized demonstration that went beyond the proper scope of a view, otherwise conducted himself within the requisite strictures; where the lack of an objection by defense counsel during the view indicated a lack of prejudice; where the judge properly instructed the jury on their consideration of the evidence; where the prosecutor did not repeat his error during closing argument; and where the demonstration was mostly cumulative of evidence adduced at trial. [198-201]

Statement that this court will henceforth require, as a matter of common law, that judges attend a view. [201-202]

A criminal defendant failed to demonstrate that the prosecutor made a statement during his opening that he knew he could not prove. [202-203]

At a murder trial, the judge acted within his discretion in allowing in evidence expert testimony to the effect that there was a "fracture" match between the exposed end of a roll of electrical tape found in the defendant's home and one end of a piece of tape found on the murder weapon, where the judge credited the foundational testimony of the expert as to the general acceptance of fracture match theory within the scientific community and relied on the witness's education, training, and experience, as well as the judge's own common sense, in appropriately evaluating the reliability of fracture match theory, which depends not on esoteric principles but on common experience within the grasp of an ordinary jury; and where the expert had sufficient education, training, experience, and familiarity with the subject matter. [203-206]

At a murder trial, the admission in evidence of tape recordings of telephone calls made by the defendant while detained pending trial did not violate the defendant's privacy rights. [206-207]

At a murder trial, the judge's instructions to the jury that they were to consider only the case against the defendant and not the possible guilt of others did not deprive the defendant of his third-party culprit defense. [207-208]

INDICTMENTS found and returned in the Superior Court Department on October 3, 2002.

The cases were tried before *Charles T. Spurlock*, J., and a motion for a new trial, filed on July 15, 2009, was considered by him.

*Chrystal A. Murray* for the defendant.

*David D. McGowan*, Assistant District Attorney (*Patrick M. Haggan*, Assistant District Attorney, with him) for the Commonwealth.

SPINA, J. The defendant was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, unlawful possession of a firearm, unlawful possession of a large capacity feeding device (G. L. c. 269, § 10 [*m*]), and unlawful possession of ammunition. He filed a motion for a new trial, which was denied. His appeal from the denial of the motion for a new trial has been consolidated with his direct appeal. On appeal, the defendant asserts the following errors, all of which were included in his motion for a new trial: (1) during the view the prosecutor asked the jury, who were standing where eyewitnesses had been positioned at the time of the crime, if they could recognize his features as he stood where the defendant allegedly shot the victim; (2) the prosecutor made a statement during his opening that he knew he could not prove; (3) expert testimony to the effect that there was a "fracture match" between the exposed end of a roll of electrical tape found in the defendant's home and one end of a piece of tape found on the murder weapon was both incompetent and not based on science that had been shown to be reliable; (4) evidence of tape recordings of telephone calls made by the defendant while incarcerated pending trial was admitted in violation of the defendant's privacy rights; and (5) the judge instructed the jury to consider only the case against the defendant and not the possible guilt of others, and thus eviscerated the defense that another person at the scene had shot the victim. We affirm the convictions, and we decline to reduce the degree of guilt or order a new trial pursuant to our power under G. L. c. 278, § 33E.

1. *Background.* The jury could have found the following facts. We reserve other details for discussion of specific issues. At approximately 9:40 P.M. on August 13, 2002, the defendant

was walking behind a house at 30 Ridgewood Street in the Dorchester section of Boston. He bent down and removed a gun from under a porch at 26 Ridgewood Street. He then walked between those houses toward Ridgewood Street. As he walked across Ridgewood Street an automobile stopped to let him cross. The defendant stopped, pointed the gun at the driver, and fired eighteen shots into the car. The driver, a man returning home to his family after work, was killed.

Five people who were on porches of apartments at 21 and 25 Ridgewood Street witnessed the shooting and identified the defendant as the shooter. Two of the five had known the defendant, who lived at 57 Ridgewood Street, for at least five years. Two others had known him for about one year; one of them was about fifteen to twenty feet from the defendant as he shot. The fifth knew him less well, but he was about twenty-five feet from the defendant during the shooting. The area was well lit by porch and street lights, and the headlights of the victim's car shone on the defendant, who stood ten feet in front of the car as he shot.

After the shooting stopped, the defendant returned through the space between the houses at 26 and 30 Ridgewood Street, then reappeared between the houses at 30 and 32 Ridgewood Street, but without a gun. He proceeded to cross the street. At about this same time two or three men who were sitting on a porch at 36 Ridgewood Street stood up and walked across the street to a black Infiniti automobile that was parked in front of 29 Ridgewood Street and drove away in reverse, without headlights.[1] There were differing accounts by witnesses as to whether three or four men entered the black Infiniti, and whether the defendant was among them. Although one of the three men, Kenneth August, was similar in appearance to the defendant, no one identified him as the shooter.

The Infiniti stopped at the top of Ridgewood Street as a police cruiser was turning into the street to respond to the shooting. The officers did not apprehend the men in the Infiniti at that time, but they noted the registration plate and the presence of three occupants. The officers requested assistance from

---

[1] This section of Ridgewood Street is designated a one-way street, and the location of the victim's car prevented the Infiniti automobile from moving forward.

other officers to stop the car. The Infiniti was stopped about ten minutes later. The defendant was not inside. The jury could have concluded that the three occupants of the Infiniti, who had been inside since it left the crime scene, said they were willing to be interviewed. They were taken to a police station where they gave statements and were released.[2] Only the fingerprints of the three occupants were recovered from the Infiniti. Part of the defense at trial was misidentification of the defendant as the shooter, whom the defendant suggested was August.

When police arrived at the scene, one eyewitness directed an officer to the area behind 26 Ridgewood Street. The officer reached under an unenclosed porch and recovered a Calico M950 semiautomatic handgun with a velvet bag attached by black electrical tape to the spent cartridge ejection port of the gun. The bag contained eighteen spent shell casings. The jury could have found, based on the testimony of a ballistics expert, that the gun was the murder weapon and that the eighteen spent shell casings had been fired from the gun. The magazine of the gun had a capacity of fifty rounds of nine millimeter ammunition, and there were seventeen live rounds in the magazine when it was found.

The defendant returned to his apartment and suggested to his girl friend that they go to New York City. That same night they went to Fall River, then traveled by bus to New York. They stayed in a motel in New York City for a few days. From New York they went to California, where they stayed several weeks at the home of a friend of the defendant. One day the defendant's girl friend overheard a telephone conversation between the defendant and one of his family members in which the defendant said "someone had gotten shot at and it was the wrong person." The defendant told his girl friend shortly thereafter that he had shot someone and thought it was the wrong person. She returned to the Boston area and had no further contact with him.

Police obtained a search warrant on August 21, 2002, for 57 Ridgewood Street, apartment no. 1, where the defendant had been living with his girl friend and another individual. Among the items seized during the execution of the warrant were four

---

[2]The three occupants were indicted as accessories after the fact of murder, but those indictments were nol prossed before the trial of this case.

magazines about guns and a roll of black electrical tape from the top dresser drawer in the defendant's bedroom. A senior criminalist with the Boston police department compared the end of the roll of tape with the ends of a piece of tape affixed to the Calico M950 handgun. She found a "fracture match" from which she opined that the piece taken from the gun had been severed from the roll of tape seized from the defendant's bedroom dresser drawer.

On June 13, 2003, the defendant was stopped for a moving motor vehicle violation in the Miami area of Florida. He was arrested for having a counterfeit driver's license, and a fingerprint scan revealed his true identity. Miami police thereupon learned of the existence of an outstanding warrant against him in Massachusetts for murder. While awaiting trial at the Nashua Street jail in Boston, the defendant telephoned family members. The telephone calls were recorded and played to the jury. In those recorded telephone calls the defendant referred to his girl friend, who testified at trial pursuant to a grant of immunity, as a "snitch" and a "rat."

2. *View by jury.* The jury were taken on a view of the scene of the shooting. Neither the judge nor the defendant attended.[3] During the view the prosecutor, who is not the prosecutor representing the Commonwealth on appeal, addressed the jury and invited them to stand on the porch at 21 Ridgewood Street and "look directly at the street, Ridgewood Street . . . . Look around you at the street lights. Pay particular attention to the distance . . . from that porch to the middle of the street, and whether or not there is anything impeding your view from the porch to things in the street. *And I'm going to stand in the middle of the street and ask you to take notice of whether or not you can see my physical features from the porch*" (emphasis added). There was no objection, and defense counsel, who is not appellate counsel for the defendant, stated, "Nothing to add."

The defendant contends that the prosecutor's unauthorized demonstration turned the jurors into unsworn witnesses for the Commonwealth and made his own physical features real evidence

___

[3]The judge did not attend because the defendant chose not to attend and the judge thought his own absence would help draw attention away from the defendant's absence.

in the case. He further contends that this incident during the view violated his right to trial by jury and his right to confront and cross-examine witnesses protected by the Sixth Amendment to the Federal Constitution and art. 12 of the Massachusetts Declaration of Rights. The defendant acknowledges there was no objection and that the standard of review is for a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

"Although what is seen on the view may be used by the jury in reaching their verdict, in a 'strict and narrow sense a view may be thought not to be evidence.' " *Commonwealth* v. *Curry*, 368 Mass. 195, 198 (1975), quoting *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 30 (1923). Properly speaking, "[n]o evidence should be taken or testimonial comments made during the taking of a view." M.S. Brodin & M. Avery, Massachusetts Evidence § 4.2.5, at 123 (8th ed. 2007). See *Commonwealth* v. *Dascalakis*, *supra* at 29-30. During a view "the essential features [of the crime scene] may be pointed out by counsel . . . , it being permissible . . . merely to point out to the jury 'marks, matters, and things,' but not otherwise to speak to the jury." *Id.* at 29. A view is not part of the trial, and a defendant is therefore not constitutionally entitled to attend. *Commonwealth* v. *Snyder*, 282 Mass. 401, 413 (1933), aff'd, 291 U.S. 97 (1934). See *Commonwealth* v. *Gordon*, 422 Mass. 816, 849 (1996) (no right to attend under Sixth Amendment). However, the particular circumstances of a case may be such that events at a view may deny a defendant a fair proceeding and thereby deprive him of due process. See *Commonwealth* v. *Evans*, 438 Mass. 142, 150-151 (2002), cert. denied, 538 U.S. 966 (2003). A defendant making such a claim must show substantial harm. *Snyder* v. *Massachusetts*, 291 U.S. 97, 118 (1934). See *Commonwealth* v. *Cresta*, 3 Mass. App. Ct. 560, 563 (1975). "Generally, an impropriety occurring on a view may be cured by cautionary instructions." *Id.* at 560, 562-563, citing *Commonwealth* v. *Madeiros*, 255 Mass. 304, 313 (1926). See *Commonwealth* v. *Hardy*, 431 Mass. 387, 391-392 (2000).

The defendant raised this issue in his motion for a new trial, and the judge concluded that "the prosecutor acted properly in pointing out an essential feature of the scene, the witnesses'

vantage point of the shooter's location on Ridgewood Street."
This was error. The prosecutor did more than that. He positioned
the jury where witnesses observed the shooting and asked them
if they could see his physical features. We agree with the defend-
ant that the prosecutor essentially conducted an unauthorized
demonstration that went beyond the proper scope of a view. We
turn to the question whether this error created a substantial
likelihood of a miscarriage of justice.

The prosecutor's conduct during the view was in all other
respects within the strictures of *Commonwealth* v. *Dascalakis*,
*supra*. He asked the jury at the view to take note of the width
of Ridgewood Street, the width of the sidewalks, the location of
street lights, whether anything obstructed their view of the
street from the various porches, and the distances from the vari-
ous porches to the middle of the street, conformably within the
limits of permissible statements by counsel during a view. See
*id*. His requests were properly designed to assist the jury's
understanding of the testimony and exhibits at trial, which de-
picted a neighborhood with a compact urban design. The trial
record indicates that houses in the area were in close proximity,
that porches extended nearly to the sidewalks, and that sidewalks
nearly abutted Ridgewood Street. Street lights were plentiful,
and porch lights added to the illumination of the area at nighttime.
Photographic exhibits depicted the area shortly after the crime,
at night. There was never any dispute that the crime occurred at
night. Although the prosecutor's demonstration was made dur-
ing daylight conditions, none of the identifying witnesses was
challenged as to his or her ability to observe the defendant at
the time of the shooting, either because of distance or lighting
conditions, or both.

We consider the absence of an objection by defense counsel
during the view, or at the time the jury returned to the court
room, as an indication that the prosecutor's demonstration was
not prejudicial. Cf. *Commonwealth* v. *Kozec*, 399 Mass. 514, 518
n.8 (1987) (although not determinative, absence of objection
provides some guidance whether prosecutor's argument was
prejudicial).

We also consider the judge's instructions. Here, the judge
instructed the jury prior to the view that anything they may see

or hear outside the court room is not evidence, and that they were to decide the case solely on the evidence presented in the court room. He also told them that statements, arguments, and questions by the lawyers were not to be considered as evidence. In his final instructions the judge repeated these instructions, and he specifically added that the view was not evidence but merely an attempt to assist them in understanding the testimony of the witnesses. The jury are presumed to have followed those instructions. See *Commonwealth* v. *Taylor*, 455 Mass. 372, 386 (2009), citing *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990); *Commonwealth* v. *Madeiros, supra.*

In his closing argument, the prosecutor did not repeat his error at the view. He did not ask the jury if they remembered being able to make out his physical features. He properly and accurately recalled the testimony of the identifying witnesses, three of whom he described as having a "perfect view" of the crime based on their proximity to the shooting and the lighting conditions. He properly reminded the jury that during the view they stood in the same places from which the identifying witnesses testified they saw the shooting. The prosecutor also recalled the testimony of the witness who was closest to the shooting, repeating his answer to a question concerning the distance between the witness and the defendant at the time of the shooting. The witness indicated that the distance was about the same as that between the prosecutor and the witness at that moment in the trial, specifically, fifteen or twenty feet. The witness further indicated he could see the defendant's face. This portion of the witness's testimony itself constituted a demonstration at trial, and it occurred without objection. It was entirely proper, see *Commonwealth* v. *Shea*, 401 Mass. 731, 737 (1988); 2 Criminal Practice Manual § 66:3 (West 2010), and because the jury heard this testimony in the context of the trial, it was far more compelling than what occurred during the view. We conclude that, for the foregoing reasons, the prosecutor's demonstration during the view was mostly cumulative of the evidence adduced at trial, and any difference did not create a substantial likelihood of a miscarriage of justice.

We are compelled to comment on the judge's decision to absent himself from the view. Although in times past it was not

uncommon for judges to forgo accompanying juries on a view, see *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 30 (1923), we strongly disapprove and henceforth require as a matter of our common law that judges attend a view. A judge who is present can address and cure at the earliest practicable time any improprieties that may occur on a view. See *Commonwealth* v. *Hardy*, 431 Mass. 387, 391-392 (2000); *Commonwealth* v. *Madeiros*, 255 Mass. 304, 313 (1926). This is especially important if something potentially prejudicial occurs but defense counsel fails to object.

3. *The prosecutor's opening statement.* The prosecutor stated in his opening statement that he expected witnesses would testify that the defendant entered the Infiniti after the shooting. He then stated that as the Infiniti was backing up, the defendant got out of the car near his house on Ridgewood Street. The defendant argues that the prosecutor had no basis for this last statement, and that it prejudiced his defense of misidentification because witnesses testified that the shooter entered the Infiniti and when the car was stopped ten minutes later the defendant was not inside, but Ken August — who looks like the defendant — was inside. There was no objection, so we review to determine if any error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

Immediately after making the statement about which the defendant complains, the prosecutor told the jury, "[T]o the extent that you hear evidence that he walked past the car and didn't get in, the evidence is still clear that the shooter, the killer in this case was none other than [the defendant]." As the prosecutor had predicted, witnesses gave conflicting testimony. There was testimony that the defendant entered the Infiniti, and there was testimony that he walked past it.

The jury could have believed witnesses who said the defendant entered the car. They also could have believed the witness who said that as the car was backing up it briefly stopped a short distance from the shooting. That would have been near the defendant's home. The car then resumed its course. From this evidence the jury could have inferred that the defendant got out of the car near his apartment. There was support for such a finding from evidence that the police saw only three men in the

car as it was backing down the street, and only three men were inside ten minutes later.

Alternatively, the jury could have believed the testimony of the witness who said the defendant did not enter the Infiniti and the testimony of the witness who said he did not see him enter. There was support for such a finding from evidence that those witnesses knew both the defendant and August, and although they did not witness the shooting, they were closer to where the Infiniti was parked and had a better view of who entered the car. The jury also could have found support from evidence of the absence of the defendant's fingerprints in the Infiniti.

Moreover, the point the prosecutor was making was that the manner in which the defendant left the crime scene was not important. What was important was that every eyewitness to the crime would identify the defendant alone as the shooter. The witnesses also consistently placed August at a location other than in front of the victim's car at the time of the shooting.

Contrary to the defendant's suggestion, if the jury believed a witness was mistaken about the defendant's presence in the Infiniti, they were not required to believe that the witness also was mistaken about the defendant's role as shooter. The jury could believe all, some, or none of the testimony of any witness. See *Commonwealth* v. *Harbin*, 435 Mass. 654, 658-659 (2002). We conclude that the prosecutor's opening statement was based on what he reasonably could expect to prove, and the evidence in fact materialized as he predicted. Moreover, there is nothing in the record to suggest the prosecutor acted in bad faith. There was no error. See *Commonwealth* v. *Fazio*, 375 Mass. 451, 454-456 (1978).

Because there was no error in the prosecutor's opening statement, there could be no ineffective assistance of counsel for failing to object to the opening statement. See *Commonwealth* v. *Silva*, 455 Mass. 503, 528 (2009).

4. *Expert testimony.* The defendant argues that the judge erred by admitting the opinion testimony of a criminalist with the Boston police department that one end of a piece of black electrical tape that held the velvet bag to the ejection port of the gun matched the end of the roll of electrical tape seized from the defendant's apartment. He asserts that the Commonwealth

had failed to establish both that the science of "tape-end" (fracture) matching was reliable and that the criminalist was a competent expert in this field. The defendant also argues that counsel's failure to challenge the criminalist's opinion on these grounds constituted ineffective assistance of counsel. In our review under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for effective assistance of counsel, we look to see if there was error, whether by the judge, the prosecutor, or defense counsel, and if there was, we then inquire if it created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

The defendant faults counsel for failing to request a hearing, pursuant to *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25-26 (1994), to test the reliability of the science of "fracture matching." He further argues that the Commonwealth failed to satisfy the *Lanigan* standard. The witness described "fracture match" as a "physical match" or "jigsaw match" that occurs when a substance or an item has been broken into one or more pieces, and the jagged ends are observed to fit together. The underlying premise of a "fracture match" is that an item that is broken or torn by human action will not be fractured in exactly the same way twice. This is because the application of human force is not precisely reproducible, and the characteristics of a break or a tear will be different every time. Thus, a break or a tear brought about by human force will be unique, and the resulting ends at the point of the break or tear will interlock in a unique "match." The crimnialist further testified that this nonreproducibility and uniqueness theory has been subject to peer review and publication, that efforts had been made to determine error rates, and that the theory has been generally accepted in the scientific community. The defendant has not refuted that testimony.

We have said that "general acceptance in the relevant scientific community will continue to be the significant, and often the only, issue." *Commonwealth* v. *Lanigan, supra* at 26. In his decision denying the defendant's motion for a new trial, the motion judge, who also was the trial judge, indicated that, notwithstanding the absence of a *Lanigan* motion challenging the reliability of fracture matching science, he performed the *Lani-*

*gan* gatekeeper analysis at the hearing on the Commonwealth's motion in limine seeking admission of the fracture match testimony. The judge implicitly accepted the foundational testimony of the criminalist as to the general acceptance of fracture match theory within the scientific community. Moreover, he indicated that he relied on the witness's education, training, and experience, and looked to his own common sense in evaluating the reliability of fracture match theory, which depends not on esoteric scientific principles but rather on common experience that is within the grasp of the ordinary jury. This analysis was appropriate in the circumstances. See *Commonwealth* v. *Goodman*, 54 Mass. App. Ct. 385, 391 (2002). We accept the trial judge's observation, and conclude that he acted within his discretion in allowing the fracture match evidence. See *Canavan's Case*, 432 Mass. 304, 312 (2000) (standard of review is abuse of discretion).

Indeed, "fracture-match" testimony has been accepted in at least five States, and the defendant has directed our attention to no case where the theory has been rejected. See *Davis* v. *State*, 2 So. 3d 952, 956 (Fla. 2008), cert. denied, 129 S. Ct. 2872 (2009) (broken knife blade); *Grim* v. *State*, 841 So. 2d 455, 458-459 (Fla.), cert. denied, 540 U.S. 892 (2003) (masking tape); *State* v. *Dressner*, 45 So. 3d 127, 134 (La.), cert. denied, 131 S. Ct. 1605 (2010) (broken knife blade); *State* v. *Smith*, 988 So. 2d 861, 867 (La. Ct. App. 2008) (wood); *Commonwealth* v. *McCullum*, 529 Pa. 117, 121 (1992) (broken jewel stone in bracelet); *State* v. *Zuniga*, 320 N.C. 233, 251-252, cert. denied, 484 U.S. 959 (1987) (pieces of torn newspaper); *State* v. *Jackson*, 111 Wash. App. 660, 667 (2002), aff'd, 150 Wash. 251 (2003) (duct tape).

There is no merit to the defendant's contention that the criminalist was not qualified to give a "fracture-match" opinion. He bases his argument largely on the alleged absence of any evidence that the witness had ever examined any evidence for a fracture match, that there was no evidence she had ever been qualified previously as a fracture match expert, and that fracture matching is not a subset of chemistry. The witness has a master's degree in forensic chemistry. She has had a wide range of fracture match experience involving a wide variety of materials in the

course of her graduate studies in forensic chemistry. She had specific practice in performing fracture matches in workshops at graduate school. At least one court has held that fracture match testimony is an appropriate subject for opinion testimony by a forensic chemist. *State* v. *Zuniga, supra* at 252-253. "There is no requirement that testimony on a question of discrete knowledge come from an expert qualified in that subspecialty rather than from an expert more generally qualified." *Commonwealth* v. *Mahoney,* 406 Mass. 843, 852 (1990). See M.S. Brodin & M. Avery, Massachusetts Evidence § 7.5.2, at 424-425 (8th ed. 2007 & Supp. 2011), and cases cited. To the point that the witness had never before been qualified as a fracture match expert, we have previously observed that "even for the most highly qualified expert there must always be a first time." *Commonwealth* v. *Rhoades,* 379 Mass. 810, 818 (1980).

"The crucial issue is whether the witness has sufficient 'education, training, experience and familiarity' with the subject matter of the testimony." *Letch* v. *Daniels,* 401 Mass. 65, 68 (1987). *Gill* v. *North Shore Radiological Assocs.,* 10 Mass. App. Ct. 885, 886 (1980) (testimony of orthodontist permissible in dental malpractice action against defendant pedodontist). We conclude that the judge acted within his discretion in allowing the witness to give fracture match opinion testimony. See *Letch* v. *Daniels, supra.*

5. *Recorded telephone conversations at jail.* The defendant argues that, although his telephone calls were properly recorded at the house of correction where he had been held as a pretrial detainee, see 103 Code Mass. Regs. §§ 482.00 (2009); Policy S482 of the Suffolk County Sheriff (2000), such recordings could only be used to further the legitimate penological and security interests of the sheriff, and not for the prosecutorial purposes of the district attorney. As such, he contends, their dissemination by the sheriff to the prosecutor and their use at trial constituted a violation of his constitutional right to privacy, and their use at trial was error. There was no objection. Our review proceeds under the standard of a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright,* 411 Mass. 678, 681-682 (1992).

We recently have said that a pretrial detainee does not have a

reasonable expectation of privacy in his recorded telephone conversations at the house of correction where he is being held, where he is on notice that all telephone calls are subject to monitoring and recording, and where the monitoring and recording are justified by legitimate penological interests. See *Commonwealth* v. *Deane*, 458 Mass. 43, 53-54 & n.8 (2010); *Commonwealth* v. *Hart*, 455 Mass. 230, 244 (2009); *Matter of a Grand Jury Subpoena*, 454 Mass. 685, 687-689 & n.6, 692-693 (2009). There was no error.

6. *Jury instruction.* The defendant contends that the judge gave an instruction that prevented the jury from considering his third-party culprit defense that August was the shooter. We disagree. The judge's instruction to the jury was:

> "You as the jury, if you conclude that the defendant is guilty, have a duty to return a verdict of guilty as to the highest crime which has been proved to you beyond a reasonable doubt. You may not draw any inference favorable or unfavorable to the Commonwealth or the defendant from the fact that any other person was not named as a defendant or is not on trial before you. *The question of possible guilt of others should not enter your thinking.* Your task is solely to determine whether the Commonwealth has proved beyond a reasonable doubt that this defendant who stands before you committed the crimes he is charged with. Remember that your verdict must be based solely on the evidence in this case and the law as I have given it to you, and not on anything else." (Emphasis added.)

This language came on the forty-eighth page of forty-nine pages of instructions in the transcript. There was no objection to the instruction.

At the midpoint of his instructions the judge gave a correct and comprehensive instruction on identification. He began by emphasizing that "one of the most important issues in this case is the identification of the defendant as the perpetrator of the crime. The Commonwealth has the burden of proving identity beyond a reasonable doubt." The judge made it abundantly clear that the Commonwealth had the burden of proving beyond a reasonable doubt that the defendant was the shooter.

We have held that, where third-party culprit evidence is

introduced and that theory of the case is argued by the defendant, it is not error to instruct the jury that the Commonwealth does not have the burden of proving no one else may have committed the murder. It is sufficient to instruct that the Commonwealth's burden is to prove beyond a reasonable doubt that the defendant committed the murder. *Commonwealth* v. *Farley,* 443 Mass. 740, 744-746, cert. denied, 546 U.S. 1035 (2005). Unlike *Commonwealth* v. *Farley, supra,* the instruction complained of here was not even linked to the identification instruction. Rather, it was linked to, and amplified, the totally unrelated instruction that no inference, favorable or unfavorable, could be drawn against either party from the absence of any other person either named as a defendant or on trial before the jury.[4]

We do not believe that there was any likelihood the jury believed for a moment that the third-party culprit theory had been removed from the case. Both defense counsel and the prosecutor addressed the third-party culprit evidence in their closing arguments, and the judge placed great emphasis on the Commonwealth's burden to prove the defendant was the shooter. Considering the jury instruction in its entirety, as we must, see *Commonwealth* v. *Vives,* 447 Mass. 537, 542 (2006), we conclude that the defendant was not deprived of his third-party culprit defense. There was no error, and in any event, there was no substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Wright,* 411 Mass. 678, 681-682 (1992).

7. *G. L. c. 278, § 33E.* We have reviewed the briefs, the arguments, and the entire record, and we conclude there is no reason to order a new trial or reduce the degree of guilt.

> *Judgments affirmed.*
>
> *Order denying motion for a new trial affirmed.*

---

[4]The sentence on which the defendant has focused is not necessary to explain the sentence it follows and should be deleted from any form instructions.