NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1000

ADOPTION OF ZARIA (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following trial, a Juvenile Court judge concluded that Zaria and David were in need of care and protection and that the mother was unfit to parent them.  The judge issued decrees terminating the mother's parental rights, concluding that the termination was in the children's best interests.[2]  On appeal, the mother claims that the judge made multiple errors in determining that she was unfit and also erred in terminating her parental rights where the Department of Children and Families (department) failed to provide a detailed adoption plan.  The mother further argues that the judge abused her discretion in leaving posttermination visitation to the discretion of the department and in failing to order more than two postadoption visits per year.  We affirm.

_____

[1] Adoption of David.  The children's names are pseudonyms.

[2] The father's parental rights also were terminated.  He has not appealed.

Background.  The department became involved with the family in 2016, before the Zaria reached her first birthday, following a physical fight between the parents over who should change the child's diaper.  Both parents were criminally charged in connection with the incident.  By the time David was born in 2017, the mother and the father were living with the paternal grandmother.  The mother called the police several times for assistance in dealing with family conflicts.  The mother and the father later moved into their own apartment but separated in 2018, with the father eventually obtaining an abuse prevention order against the mother.  The mother subsequently lost her housing, after which she and the children moved around, staying sometimes with friends and at other times in hotels.  The children were removed from the mother's custody in 2019, after an incident where the children (then aged three and one-half and two) were observed leaning out of a second-story window while the mother slept.  Department employees who responded to the scene found the apartment unsanitary and in disarray.  The children, who were filthy, nonverbal, had scabies, and subsequently showed signs of food insecurity, were placed in foster care.

Soon thereafter, the mother moved into an apartment owned by the parents of her sixteen year old boyfriend.  The relationship with the boyfriend and his family was volatile, and

2

the mother again resorted to calling the police repeatedly to help her deal with conflicts. In 2020, the mother gave birth to another child, fathered by the boyfriend, who was at that time committed to the Department of Youth Services.[3]

The mother struggled with posttraumatic stress disorder, anger issues, and excessive alcohol and drug use. These factors combined to cause the mother to be found in violent and dangerous situations, often calling for a police response and resulting in the mother being sent to the hospital on a number of occasions to address both her physical and mental health. The department offered the mother various services to remedy these problems but her participation was inconsistent and ultimately her behavior did not change.

Discussion. 1. Unfitness determination. The central question in a case to terminate parental rights is whether the parent is unfit, and then if so, whether termination is in the best interest of the children. See Adoption of Ilona, 459 Mass. 53, 59 (2011). Such findings must be supported "by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). See Adoption of Mary, 414

---

[3] This child was also removed from the mother's custody in a separate care and protection proceeding not at issue in this appeal.

Mass. 705, 710-711 (1993). "We give substantial deference to a judge's decision . . . and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, supra.

Here, the judge found that the mother was unfit due to her unstable mental health, history of trauma, alcohol use, anger issues, tendency to get into violent situations with others, and unsafe and unstable housing. The judge determined that these issues demanded all of the mother's care and attention and prevented her from attending to the significant emotional, developmental, and educational needs of the children. Although the mother was offered services to address these issues, they were not remedied, as demonstrated by the numerous tumultuous situations the mother was involved in up to the time of trial.[4]

---

[4] For example, in October 2019, a razor had to be wrestled away from the mother, who was talking about harming herself due to a breakup with her boyfriend; police responded and sent her to a hospital. In June 2020, after an argument with her boyfriend, the mother became intoxicated and again had to be sent to the hospital, where she became so combative that she had to be sedated. In September 2020, neighbors called the police due to the mother and her boyfriend screaming at each other. In October 2020, police responded to the home due to a complaint about a loud party and were met by the mother, who was covered in blood; she was sent to the hospital by ambulance to treat her lacerations and alcohol intoxication. In November 2020, the mother called 911 to report her boyfriend assaulted her; she was treated at the hospital for an orbital fracture and broken nose and gave multiple conflicting accounts for her injuries. In December 2020, the mother called 911 due to an argument with her boyfriend. In February 2021, the mother was involved in a confrontation between groups of teenagers where objects were

4

The judge concluded that the children would be put at grave risk if they were returned to the mother and exposed to her "erratic and dangerous lifestyle."

On appeal, the mother argues that fifteen of the judge's findings of fact were clearly erroneous. We are not persuaded. Findings 1, 5, and 6[5] and supplemental finding 51 each concern the mother's unsafe and unstable housing. These findings were amply supported by the evidence. Regarding the mother's apartment, there was evidence of stairs in disrepair for over six months, the same stairs the mother claimed to have been the cause of her own injuries.[6] There was also evidence that the

_____

thrown and one of the teenagers was knocked unconscious by a bottle. In May 2021, the mother called the police because her boyfriend's parents were chasing her down the street, and she was defending herself with a taser. Less than one week before trial, the mother called the police because her boyfriend would not give her a ride home -- he was inside the home drinking alcohol with other minors.

[5] The mother also challenges summary finding 6 on the basis that the judge mistakenly quoted the mother's expert as if she were talking about the mother, rather than victims of domestic violence in general. Our review of the finding indicates that the judge accurately referenced the expert's testimony.

[6] The mother argues that there was no evidence of the status of the stairs at the time of trial; she contends that the judge's view of the stairs and the rest of the apartment during the mother's audiovisual testimony was not evidence. Even accepting the mother's analogy of the judge's observation to a "view," the judge was within her discretion to use the observation to help her understand the evidence. See Commonwealth v. Gomes, 459 Mass. 194, 199 (2011). The evidence came in the form of the mother testifying that the stairs had not actually been repaired as of the date of trial.

mother's housing situation was insecure as the apartment was owned by the parents of her boyfriend, with whom she had a poor relationship. Although she had lived there for two years, the mother had no lease and made inconsistent rent payments. There was also evidence that the mother was going to be evicted by the end of the year. According to the mother's own testimony, shortly before trial her landlords chased her down the street, and she pulled out a taser to protect herself. See note 4, supra. There was no error in the judge's findings concerning the mother's unsafe and unstable housing.

With respect to findings 9[7] and 10 and supplemental finding 55, all of which were based on the judge's observation that the mother could not to listen to the foster mother testify to the needs of the children These findings were not so much factual statements as they were credibility determinations of the judge's assessment of the mother's reaction to the foster mother's testimony. As such, we will not disturb them. See Custody of Eleanor, 414 Mass. 795, 799 (1993) (judge's assessment of credibility of witnesses entitled to deference).

---

[7] In summary finding 9, the judge stated that the children's medical needs were not being met at the time of their removal from mother; the judge clarified this finding in supplemental finding 24 by stating that the children were up to date medically but that the mother had previously missed several appointments.

6

The mother challenges supplemental findings 2, 9, 10, 11, 14, and 16, claiming that they impermissibly relied on G. L. c. 119, § 51A (51A report), which were admitted only to "set the stage," or on nonprimary facts in G. L. c. 119, § 51B, reports. Although the judge did cite to 51A reports, it is clear that she was indeed setting the stage. To the extent that the judge stated she "adopted" the department's conclusions, it appears that this was a short-hand reference for saying that she came to the same conclusion as the department based on admissible primary facts. There was no error.

In supplemental finding 20, the judge stated that the mother reported that "she has never taken medication for her mental health issues," citing a report from a court-appointed investigator that was admitted as an exhibit. According to the report, the mother stated to the investigator that she "doesn't take any medication." We acknowledge the discrepancy, but do not consider it to be significant. Nowhere else in the decision does the judge comment on the import of the mother taking or not taking medication for mental health. The thrust of the judge's decision is that whatever mother did to address her mental health issues, it was not sufficient to improve her parenting.

The mother also challenges supplemental finding 31 as erroneous in that, as the mother alleges, the judge found there was no domestic violence in the mother's relationships.

7

However, the judge did not actually so find; rather, the judge observed that the mother's relationships "frequently featured cycles of calm followed by cycles of violent conflict." This was amply supported by the record; there was no error.

Finally, the mother challenges conclusion of law 23, in which the judge applied the G. L. c. 210, § 3 (c), factors, claiming that the judge erroneously found that factors iii, vii, and x were relevant. The mother contends that factor iii (failure to maintain significant and meaningful contact with the child) and x (willful failure to visit the child) were not relevant because she had maintained contact and had visited the children  Whether the judge should have categorized these factors as relevant or not, she did conclude that the mother maintained contact with the children. As to factor vii (child's bond with substitute caretaker), the mother contends that it was error for the judge to find this factor relevant since, regardless of the bond, it would eventually have to be broken because the foster parent was not going to adopt the children. The judge used this factor to comment on the bond between the foster mother and the children. We see nothing that suggests the judge used this factor, or the other two challenged factors, as a basis for termination. There was no error.

We have carefully reviewed the challenged findings and conclude that the record evidence supported those findings by a

preponderance of the evidence. See Adoption of Jacques, 82 Mass. App. Ct. at 606. Moreover, the unchallenged findings alone establish clearly and convincingly that the mother is unfit and that termination is in the best interests of the children. There was no abuse of discretion.

2. Adoption plan. The mother argues that the judge erred in terminating her parental rights in the absence of a detailed adoption plan. While G. L. c. 210, § 3, mandates that the judge review and consider the adoption plan proposed by the department, see Adoption of Hugo, 428 Mass. 219, 226 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999), "[t]he adoption plan need not be fully developed to support a termination order." Adoption of Willow, 433 Mass. 636, 652 (2001). See Adoption of Vito, 431 Mass. 550, 568 n.28. Instead we look to determine whether the adoption plan "provide[d] sufficient information about the prospective adoptive placement 'so that the judge may properly evaluate the suitability of the department's proposal.'" Adoption of Willow, supra at 652-653, quoting Adoption of Vito, supra.

Here, at the time of trial, the department had not identified an adoptive placement for the children. "[T]he absence of imminent adoption prospects does not, by itself, invalidate a decision to terminate parental rights." Adoption of Jacques, 82 Mass. App. Ct. at 610. See Adoption of Vito, 431

Mass. at 568 n.28.  However, the adoption social worker testified both to the department's intent to keep the children together and to the characteristics and qualifications that the department sought in any prospective preadoptive family.  In particular, the department aimed to find a family that could understand and advocate for the children's educational and physical needs, ideally a two-parent home where the family would commit to postadoption visitation by the mother; additionally, the foster mother would be involved in the transition of the children to a preadoptive home.  In this case, the judge had sufficient information to approve the adoption plan.

3.  Posttermination and postadoption visits.  The mother argues that the judge abused her discretion in leaving posttermination visitation to the discretion of the department and ordering only two postadoption visits per year.  She suggests monthly posttermination visits and quarterly postadoption visits would serve the best interests of the children.

Once a parent is established as unfit, the decision whether to grant posttermination and postadoption visits is within the judge's discretion.  See Adoption of John, 53 Mass. App. Ct. 431, 430 (2001).  The decision should be based on the best interests of the child.  See Adoption of Ilona, 459 Mass. at 63. The purpose of posttermination and postadoption visitation is

10

not to strengthen the bond between parent and child but rather to ease the child's transition to another home. See Adoption of Vito, 431 Mass. at 564-565. With regard to postadoption visitation, "[a] judge must balance the benefit to the child . . . with the intrusion that an order imposes on the rights of the adoptive parents." Adoption of Ilona, supra at 64.

Here, the judge found that there was a bond between the mother and the children and so ordered a minimum of two postadoption visits per year. The judge left frequency of posttermination visits to the discretion of the department so that visits could be tapered leading up to adoption. Although the mother is concerned that the department will not allow more than the minimum two visits per year set out by the judge, there is nothing in the record to suggest that the department will act contrary to the best interests of the children with respect to visitation with the mother. Additionally, the mother has not demonstrated that the judge's decision to order postadoption visits twice a year, rather than quarterly, amounted to an abuse of discretion. See L.L. v. Commonwealth, 470 Mass. 169, 185

n.27 (2014) (abuse of discretion is when decision falls outside of range of reasonable alternatives).

Decrees affirmed.

By the Court (Vuono, Singh & Englander, JJ.[8]),

*Joseph F. Stanton*

Clerk

Entered:  December 12, 2023.

---

[8] The panelists are listed in order of seniority.