NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11523

COMMONWEALTH vs. EDWARD CORLISS.

Suffolk.     October 29, 2014. - January 20, 2015.

Present: Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.

Homicide. Firearms. Robbery. Practice, Criminal, View, Loss of evidence by prosecution, Capital case. Evidence, Firearm, Jury view, Prior misconduct, Relevancy and materiality, Exculpatory, Expert opinion, Experiment. Witness, Expert.

Indictments found and returned in the Superior Court Department on February 25, 2010.

The cases were tried before Diane M. Kottmyer, J.

Stephen Neyman for the defendant.
Mindy S. Klenoff, Assistant District Attorney (Patrick M. Haggan, Assistant District Attorney, with her) for the Commonwealth.

BOTSFORD, J.  A jury convicted the defendant, Edward

Corliss, of murder in the first degree on the theories of

deliberate premeditation and felony-murder, and of unlawful

possession of a firearm, and robbery while armed and masked.

The defendant appeals, claiming (1) the trial judge's

restrictions on the defendant's attendance at a jury view were improper; (2) it was error to admit a witness's testimony that he saw the defendant with a gun more than one year before the shooting in question occurred; (3) the "destruction" by police of money seized from the defendant's residence without first examining the money for fingerprints or deoxyribonucleic acid (DNA) warrants dismissal of the charges against him; and (4) it was error to exclude the video and testimony of the defendant's expert showing that surveillance footage of the shooting distorted the height of the perpetrator.  Finally, the defendant asks us to reverse his convictions under G. L. c. 278, § 33E. We affirm the convictions and decline to grant relief under G. L. c. 278, § 33E.

Background.  We recite the facts as the jury could have found them at trial, reserving some facts for later discussion. On the afternoon of December 26, 2009, Surendra Dangol, the victim, was working alone as a clerk at a convenience store located on Centre Street in the Jamaica Plain neighborhood of Boston.  At approximately 2:45 P.M., a white motor vehicle stopped on Eliot Street opposite the store, at the intersection of Eliot and Centre Streets.  A person wearing a hat and a bulky coat, and carrying a backpack, approached the vehicle and appeared to speak briefly with the driver, who had lowered the window.  The vehicle then backed up on Eliot Street, away from

the intersection with Centre Street and out of view of the store's surveillance cameras.

Minutes later, at approximately 2:56 P.M, a person who appeared to be the same individual wearing a bulky coat entered the store, put the backpack on the counter by the register and pointed a gun at the victim, who stood behind the counter. The victim put both hands in the air. The gunman handed his backpack to the victim, who opened the cash register and, still at gun point, transferred the money from the register into the backpack. Once the victim finished doing so, the gunman continued to point the gun at the victim, who stretched both hands out to either side. The gunman then shot the victim, and the victim fell to the ground. The gunman took his backpack from the counter and left the store, running down Eliot Street in the same direction in which the white vehicle had driven in reverse before the robbery. Seconds later, the vehicle drove down Eliot Street toward Centre Street and the store, turned right onto Centre Street, and drove away. The store was missing $746 following the robbery.

A customer entered the store shortly after the shooting and heard a gasping noise emanating from behind the counter. The customer found the victim lying motionless and telephoned 911. Boston police officers and paramedics arrived at the scene. The victim was transported to a hospital, where he was pronounced

dead shortly after his arrival. An autopsy revealed that the cause of death was a gunshot wound to the victim's chest.

Police secured the scene and reviewed video recorded by the store's surveillance cameras. The police made efforts to enhance the video of the white vehicle shown on Eliot Street immediately before and after the robbery and shooting, but were unable to determine the license plate or any details about the appearance of the driver.

The police showed photographs of the white vehicle to an automobile sales manager and a police officer with experience in automobile accident investigations, both of whom identified it as a Plymouth Acclaim made between 1989 and 1995. Both also noted that the vehicle in the surveillance video had hubcaps that were "after-market," i.e., not included with the vehicle when it was originally manufactured, and the officer noted that the brake light in the vehicle's rear window appeared not to be functioning properly.

The police obtained from the registry of motor vehicles a list of white Plymouth Acclaims registered in Massachusetts that were made between 1989 and 1995. One such vehicle was registered to Jacqueline L. Silvia, the defendant's wife, who lived with the defendant on Hyde Park Avenue in the Roslindale section of Boston. The police conducted surveillance of the white Acclaim in the weeks following the shooting and, in early

January of 2010, observed Silvia driving it with the defendant in the passenger seat.

On January 15, 2010, police sought and obtained a search warrant for Silvia's Acclaim. Upon examining the vehicle at the police station, the police observed that, similar to the white vehicle in the surveillance video, the Acclaim had after-market hubcaps, and the brake light in the rear window was close to burning out and, thus, producing less light than intended.

The defendant also admitted to three different people that he had committed a robbery and had shot someone at the store. In particular, on the night of the incident, while the defendant was visiting his brother, he pulled dollar bills of various denominations out of his pocket and told his brother that he had "pulled a score" during which he killed a man in the store who had lied to him by saying that there was no money in the register; he also stated that he had no remorse about the incident. Later, while being held in custody before trial, the defendant told a fellow inmate that he entered a store intending to rob it; that he shot a man inside the store (to whom the defendant referred as a "sand nigger"); that the vehicle used in the offense was his wife's Plymouth; and that he disposed of the gun used in the shooting along Revere Beach. The defendant told another inmate that he robbed the store while wearing a wig and a puffy outfit, and shot the store clerk; he killed the clerk,

he explained, to ensure that there would be no witnesses to the robbery. The defendant added that he had disposed of the gun used in the shooting in the water. In addition, fearing Silvia's possible testimony against him in court, the defendant asked the inmate to kill Silvia upon the inmate's release from prison, and gave him details of Silvia's whereabouts and routines to facilitate her killing.[1]

Based on information they had received during the course of their investigation, the police searched a rocky portion of Revere Beach several times. During their third search police found a handgun in the sand. Ballistics testing confirmed that the bullet removed from the victim's body was fired from this gun. The Commonwealth also presented evidence that the defendant had told his brother that he often carried a gun for protection that he referred to as his "buddy." Finally, there was evidence that, prior to the robbery of the store, the defendant had told his brother in December of 2009 that he was experiencing financial trouble due to a decrease in his Social Security benefits.[2]

---

[1] The defendant also asked the inmate to kill a neighbor and a friend of the defendant, both of whom the defendant believed had provided testimony against him.

[2] The defendant also told his parole officer that his Social Security payments decreased in early December of 2009 despite an increase in his rent obligation.

Discussion. 1. Jury view. The defendant argues that the trial judge erred in denying his request to attend a view that would be separate from, but identical to, the view taken by the jury. Acknowledging that the judge did allow him to attend the jury view, the defendant further claims that the judge erred in confining him to a vehicle during the view. Finally, the defendant relies on Commonwealth v. Morganti, 455 Mass. 388, 403 n.9 (2009), S.C., 467 Mass. 96 (2014), to argue that his presence was required throughout the jury's view because, he claims, the view involved an experiment or demonstration, and in any event, the view could have been avoided. There was no error.

The background facts are the following. The Commonwealth's pretrial motion for a view by the jury was allowed without objection. Prior to the view, the defendant wavered as to whether he wished to be present for the jury's view or to attend a separate view, but ultimately indicated a preference for the latter. The judge stated that under existing case law, the defendant had no constitutional right to be present during the view. Furthermore, the judge noted that there was some information available indicating that the defendant had plotted to escape from custody and had spoken about killing prison guards, and that this evidence dictated the need for security personnel to accompany the defendant on any separate view. The

judge was skeptical about the feasibility of conducting a separate view for the defendant, given the shortage of security personnel available, but indicated that she would look into whether a private view for the defendant was practicable. The judge thereafter did not mention the issue of a separate view, but ultimately ruled, based on security concerns, that the defendant could not be present with the jury during their view, but that security personnel would transport the defendant in a separate vehicle and the vehicle would be positioned to allow the defendant to observe each location on the jury view to the extent possible. The judge prohibited the defendant from leaving the vehicle during the view, but provided him with a "notice of view details," drafted by the Commonwealth, which described "precisely what it is that the Commonwealth [pointed] out to the jurors."

The jury went on the planned view, during which counsel for the Commonwealth and for the defendant showed jurors the area surrounding the store, the interior of the store, the exterior of the defendant's residence, Sylvia's white Acclaim, a rock jetty along Revere Beach, and the exterior of a business establishment in Revere. The defendant was unable to view the interior of the store, but the judge noted her expectation that the Commonwealth would introduce depictions of relevant aspects of the store at trial.

"'We have held repeatedly that a defendant does not have a right to be present during a jury view' under either the Sixth or the Fourteenth Amendment to the United States Constitution or art. 12 of the Massachusetts Declaration of Rights." Morganti, 455 Mass. at 402-403, quoting Commonwealth v. Gordon, 422 Mass. 816, 849 (1996). This is so because a "view is not part of the trial," Commonwealth v. Gomes, 459 Mass. 194, 199 (2011), due to the fact that, "[a]lthough what is seen on the view may be used by the jury in reaching their verdict, in a 'strict and narrow sense a view may be thought not to be evidence.'" Id., quoting Commonwealth v. Curry, 368 Mass. 195, 198 (1975). See Berlandi v. Commonwealth, 314 Mass. 424, 451 (1943); Commonwealth v. Snyder, 282 Mass. 401, 412-413 (1933), aff'd, 291 U.S. 97 (1934). Accordingly, it was not required that the defendant observe what the jury saw on their view, either during the view itself or on a separate occasion. Rather, a trial judge has discretion whether to permit a defendant to be present at a jury view, "may consider issues of security in deciding whether to permit a defendant to be present," as the judge did here, and "may impose reasonable conditions or restrictions" on a defendant attending such a view. See Commonwealth v. Evans, 438 Mass. 142, 151 (2002), cert. denied, 538 U.S. 966 (2003). Given the security risk posed by the defendant, the judge's decision to confine him to a police vehicle during the jury view was

reasonable and well within her discretion.  See <u>Commonwealth</u> v.

<u>Mack</u>, 423 Mass. 288, 291 (1996) (affirming trial judge's

decision that defendant could attend jury view only if he

remained "in a police car and some distance away from the

jury").[3]

2.  <u>Admission of evidence that the defendant possessed a</u>

<u>firearm</u>.  The defendant challenges the trial judge's decision to

allow a witness, Robert Dauteuil, to testify that sixteen months

before the store robbery and shooting, he saw the defendant with

a firearm that the defendant proceeded to load with bullets.  We

disagree.

The pertinent background facts are these.  Before trial,

the Commonwealth filed a motion to permit Dauteuil, a friend of

---

[3] The defendant's reliance on <u>Commonwealth</u> v. <u>Morganti</u>, 455 Mass. 388, 403 n.9 (2009), <u>S.C.</u>, 467 Mass. 96 (2014), is misplaced.  That footnote states, "Because no demonstration was performed during the view and the automobile [that was a subject of the jury view] plainly could not be brought into the court room, we need not consider whether the defendant's presence would be required if there had been a demonstration or if the view could have been avoided."  This statement concerned the specific facts of the <u>Morganti</u> case, where the automobile the jury were viewing featured, in the front passenger seat, a mannequin that had a rod through its head to demonstrate "the path of travel of the bullet that killed the victim."  <u>Morganti</u>, <u>supra</u> at 402.  There were no such unusual features of the jury view in this case -- it was, as the judge remarked, a "classic view," in which counsel for the Commonwealth and the defendant pointed out particular locations and features to the jury without comment.  The <u>Morganti</u> footnote should not be understood to suggest that whenever the defendant does not accompany the jury on a view, the trial judge is obligated to make a specific determination whether the view could have been avoided by introduction of evidence that would provide the same illustrative information.

the defendant, to testify as just described. The Commonwealth sought to admit this testimony, in part, because, in the Commonwealth's view, it would allow the jury to infer that the gun seen by Dauteuil was the murder weapon. The judge noted the relevance of evidence showing a defendant "to have knowledge of and the ability to use firearms," and allowed the Commonwealth's motion, concluding the probative value of Dauteuil's proposed testimony outweighed its prejudicial effect.

Dauteuil testified at trial that he saw the defendant holding a handgun and putting bullets into the clip of the gun at the defendant's home in August of 2008. He stated that the gun was black and that the bullets, of which there were between six and eight, were silver and "a little bigger" than a .22 caliber bullet.[4] Dauteuil conceded that he was "not familiar with guns," but stated that he was sufficiently familiar with them to recognize the size of the bullets. Upon being shown a photograph of the gun retrieved from Revere Beach, Dauteuil stated that the gun the defendant had in 2008 was similar in size and shape to the gun in the photograph, but he stopped short of saying that the two guns were the same. The defendant objected.

---

[4] Later, the Commonwealth introduced evidence that the murder weapon took bullets that were larger than .22 caliber bullets.

At the time Dauteuil testified about the gun, the judge instructed the jury that they were precluded from considering the testimony as evidence that the defendant committed a crime by possessing a firearm in August of 2008, or from considering the testimony as evidence of the defendant's bad character or propensity to commit crimes. She stated that they could consider Dauteuil's testimony, if they deemed it credible, only to determine whether the defendant had access to a firearm and knowledge of how to operate a firearm at the time of the shooting in the store. The judge repeated these instructions during her final charge.

"It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." Commonwealth v. Helfant, 398 Mass. 214, 224 (1986), and cases cited. As the trial judge recognized, one such purpose is "to show that the defendant has the means to commit the crime." Commonwealth v. Ridge, 455 Mass. 307, 322 (2009). "The judge, within sound discretion, must consider whether the probative value of such evidence is outweighed by potential prejudice," Commonwealth v. Gollman, 436 Mass. 111, 114 (2002), and the judge's determination is "not disturbed absent palpable error."

Commonwealth v. McGee, 467 Mass. 141, 156 (2014), quoting Commonwealth v. Spencer, 465 Mass. 32, 48 (2013). See Commonwealth v. Ashman, 430 Mass. 736, 744 (2000) (admission of "[e]vidence that a defendant possessed a weapon that could have been used to commit a crime" to show that defendant had means to commit crime is left to discretion of trial judge whose decision will be accepted on review except for palpable error).

We discern no error in the admission of Dauteuil's observations of the defendant's possession of a gun, even though they occurred more than one year before the shooting at the store. The testimony was relevant to show that the defendant had the means to perpetrate the crime. See McGee, 467 Mass. at 156-157. See also Ridge, 455 Mass. at 322-323 (no error in admitting "evidence of the defendant's access to, and knowledge of, firearms and bullets" where trial judge "instructed the jury that the evidence was only to show that the defendant had some familiarity with firearms and not that he was a bad person").

As for the sixteen-month interval between Dauteuil's observations and the shooting, "[p]roximity to the crime in point of time is an element to be considered in viewing the probative value of testimony, and it is a factor which should be left largely to the discretion of the judge," Commonwealth v. Watkins, 375 Mass. 472, 491 (1978), quoting Commonwealth v. Russell, 2 Mass. App. Ct. 293, 295 (1974), although it must "not

be too remote in time." Commonwealth v. Butler, 445 Mass. 568, 574 (2005), quoting Commonwealth v. Barrett, 418 Mass. 788, 794 (1994). Here, in exercising her discretion to admit the testimony, the judge indicated that the temporal remoteness of Dauteuil's observations did not preclude their admission because once the defendant knew how to operate a gun, he would retain such knowledge over time. Moreover, as stated, the judge instructed the jury twice that they could use this testimony only to determine whether the defendant had access to a firearm and knowledge of how to operate a firearm, and that they could decide "what weight, if any" to give to Dauteuil's testimony. Cf. Helfant, 398 Mass. at 226-227, 228 n.13 (evidence of defendant's prior misbehavior admitted on issue of defendant's intent and state of mind; where such evidence is relevant, jury may consider time interval between such incidents as bearing on weight to be given such evidence). See Commonwealth v. McLaughlin, 352 Mass. 218, 221, 229-230, cert. denied, 389 U.S. 916 (1967) (no error in admitting guns found in possession of defendant approximately one year after murder for which he was indicted).

The defendant argues that in addition to the question of remoteness, Dauteuil's testimony, in conjunction with later testimony by a police ballistician that the murder weapon took bullets larger than .22 caliber bullets, created significant

prejudice because it improperly linked the gun observed by Dauteuil with the murder weapon.[5]  However, "evidence of '[a] weapon that could have been used in the course of a crime is admissible'" to show that the defendant had the means to commit the crimes alleged, "even without direct proof that the particular weapon was in fact used in the commission of the crime" (internal quotations omitted).  McGee, 467 Mass. at 156, quoting Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012).  See McGee, supra at 156-157 (witness's testimony concerning gun seen in defendant's possession prior to shooting was admissible where witness's description of gun was consistent with other testimony indicating nature of murder weapon, and probative value of testimony outweighed its prejudicial effect; it was for jury to determine "any link between the gun [defendant] was said to possess and the one used to shoot the victim").  See also Ashman, 430 Mass. at 744.  Moreover, the judge's limiting instructions permitted the jury to use Dauteuil's testimony only

---

[5] Dauteuil's testimony that the gun the defendant possessed in 2008 took bullets larger than .22 caliber bullets is consistent with the ballistician's description of the gun used in the shooting.

The defendant argues that there was no foundation for Dauteuil's testimony about the size of the bullets he saw in the defendant's possession.  This argument appears to relate to the witness's statement on cross-examination that he was "not familiar with guns."  A witness, however, need not have familiarity with firearms to testify about details of a gun seen in the possession of the defendant on an earlier occasion.  See Commonwealth v. Watkins, 375 Mass. 472, 491 (1978).

to determine whether the defendant had access to a firearm and knowledge of how to operate a firearm, despite the Commonwealth's contention that the testimony was admissible to show that the gun Dauteuil observed was, in fact, the murder weapon.  We presume the jury followed these instructions, and thus the defendant received the benefit of limits greater than those to which he was entitled.  See Commonwealth v. Auclair, 444 Mass. 348, 358 (2005).  His argument of prejudice fails.

3.  Destruction of money seized from the defendant's residence.  The defendant argues that the failure of the police to retain and segregate the money seized from his residence precluded him from establishing that the victim's fingerprints or DNA were not on this money and, thus, denied him a fair trial, requiring dismissal of the charges against him.

Testimony at trial revealed that, based on information gathered during the course of their investigation, police sought and obtained a search warrant to search the defendant's apartment.  During the search, the police seized $320 -- two fifty-dollar bills and eleven twenty-dollar bills -- that were on top of the kitchen table in the apartment.  The defendant and the Commonwealth stipulated that this money had been in Silvia's possession immediately prior to being placed on the table.  The inference the Commonwealth sought to have the jury draw was that these bills were some of the proceeds of the robbery.

Sergeant Detective Michael Devane of the Boston police department testified at trial that it is police policy to document seized money and then either to hold it as evidence or submit the money to the department's cashier's office for deposit into a bank account. Upon seizing the bills from the defendant's apartment, the police photographed the money and recorded the serial numbers of each bill, but did not test any of the money for fingerprints or DNA. Ultimately, according to Devane, the seized money was deposited in a bank account consistent with police department policy. Cross-examination of Devane elicited that the police did not retain and segregate the seized bills as evidence because the police decided that the physical form of the bills did not have evidentiary value.

Before trial, the defendant moved to exclude any evidence concerning the seized bills as a sanction against the Commonwealth for "destroying" the money. The judge denied the motion and allowed the Commonwealth to introduce the evidence, concluding that there was no "showing that the Commonwealth acted deliberately or in bad faith." The judge also noted that it was speculative to suggest that the seized bills would have yielded something of evidentiary value.

"A defendant who seeks relief from the loss or destruction of potentially exculpatory evidence has the initial burden . . . to establish a reasonable possibility, based on concrete

evidence rather than a fertile imagination, that access to the [evidence] would have produced evidence favorable to his cause" (citations and quotations omitted). Commonwealth v. Cintron, 438 Mass. 779, 784 (2003). See Commonwealth v. Neal, 392 Mass. 1, 12 (1984). In other words, "the defendant must establish a reasonable possibility that the lost or destroyed evidence was in fact exculpatory." Commonwealth v. Kee, 449 Mass. 550, 554 (2007). If the defendant does not satisfy this initial burden, "there is no need to engage in [a] balancing test," Commonwealth v. Williams, 455 Mass. 706, 718 (2010), weighing "the Commonwealth's culpability, the materiality of the evidence, and the prejudice to the defendant in order to determine whether the defendant is entitled to relief." Id.

The defendant's argument fails. Assuming that testing the bills in question yielded no evidence of the victim's fingerprints or DNA, the exculpatory value of such a result appears to be slim to none. The victim may well not have touched every bill of the approximately $750 stolen in the robbery -- the surveillance video of the actual robbery makes it clear that the victim transferred the money in the cash drawer by hurriedly lifting groups or wads of bills together and stuffing them into the robber's backpack -- and therefore the absence of the victim's fingerprints or DNA on the seized bills would not indicate that the bills were not the proceeds of the

robbery. Moreover, the evidence is undisputed that the defendant's wife had held and handled the money in question after the robbery, creating the real possibility that any fingerprints or DNA that might have been on the bills before would not be identifiable. See Commonwealth v. Walker, 14 Mass. App. Ct. 544, 548-549 (1982) ("absence of the defendant's fingerprints on the [destroyed evidence] would not have proved his innocence" because "any fingerprints may have been destroyed by the handling of others" before police obtained evidence).[6]

Because the defendant has failed to satisfy his initial burden of establishing "a reasonable possibility" that "access to the [seized money] would have produced evidence favorable to his cause," we need not balance the Commonwealth's culpability, the evidence's materiality and the prejudice to the defendant. See Commonwealth v. Clemente, 452 Mass. 295, 309 (2008), cert. denied, 555 U.S. 1181 (2009), quoting Kee, 449 Mass. at 554. See also Williams, 455 Mass. at 718. The judge did not abuse her discretion in allowing the admission of evidence concerning the seized money.

4. Exclusion of images produced by the defendant's expert witness. The defendant argues that the judge's exclusion of a

---

[6] Moreover, it goes without saying that bills held in the cash register of a convenience store are likely to have been handled by a variety of individuals in addition to the convenience store clerk, including the customers who transferred the bills in exchange for the goods they purchased.

video that consisted of three images created by his expert witness, Michael Garneau, and of Garneau's testimony regarding the video, was reversible error because it infringed upon his right to present a defense.  To create the images, the defendant's expert had superimposed a height chart on top of three different images of the perpetrator captured by the store's surveillance cameras during the robbery.  The purpose -- at least as suggested by defense counsel in a voir dire of the expert held before he testified at trial -- was to show that the surveillance video footage distorted the perpetrator's height.[7]

Before she ruled on the admissibility of the superimposed video images, the judge conducted a voir dire hearing of Garneau to determine the method by which he had created the images and his proposed testimony.[8]  Garneau testified that he had extracted three still images depicting the perpetrator in the store during the robbery from the store's surveillance footage.  In August,

---

[7] In his opening statement, defense counsel had suggested to the jury that they would hear from the expert, Michael Garneau, that the perpetrator of the robbery was five feet eleven inches, whereas the defendant was only five feet five inches.  At the time of the voir dire examination of Garneau, however, defense counsel argued that the reason Garneau's testimony was important was not to indicate the perpetrator was any particular height. Rather, the reason counsel advanced was that one could not make an accurate estimate of the perpetrator's height from the video footage because the placement of the surveillance camera on the ceiling and the angle of its focus meant that the appearance of the perpetrator's height was distorted and changed depending on where the perpetrator was standing in relation to the camera at any given point in time.

[8] Garneau's qualifications as a video editing expert were not disputed and were not at issue during the voir dire.

2011, he went to the store and, with the help of the store's owner, adjusted the focus of one of the surveillance cameras mounted to the ceiling of the store to replicate as closely as possible the angle of the still images.  He then filmed a height chart attached to a metal stand that he had positioned in the "general area" of the three spaces occupied by the perpetrator of the robbery in the three 2009 surveillance images.  Thereafter, with the help of a video compositing program, he laid the video of the height chart on top of the three original surveillance images of the perpetrator.  The resulting video superimposed the lines of the height chart on the perpetrator as depicted in the original surveillance images, with each line representing one inch in height.  In two of the superimposed surveillance images, the perpetrator appeared to measure five feet five inches on the height chart, and the third image showed the perpetrator's height to measure five feet nine inches.  During his voir dire testimony, Garneau acknowledged that the interior of the store had changed in the interval between the 2009 robbery and August, 2011, and he could not say whether the store's ceiling had been renovated.  The store's video surveillance system had changed in that period as well.

Over the defendant's objection, the judge excluded the video of the perpetrator with the superimposed height chart on the grounds that it would not be helpful to the jury.  She

appeared to believe (perhaps based on the defense counsel's opening) that the defendant sought to use the superimposed images to argue that the perpetrator was a particular height, and she opined that the expert's testimony would be misleading on that point. She also indicated that there was insufficient foundation that the height chart was placed on a floor that was on the same level as the floor during the robbery, and noted that there had been "a change in the ceiling [at the store] with respect to the camera."

The judge, however, did allow admission of Garneau's video showing only the height chart, without any image of the perpetrator.[9] Furthermore, the judge allowed Garneau to testify to the distorting effect of camera angles and to the "fallacy of using a fixed object like the bolt [on the doorframe of the store visible in the surveillance footage, see note 9, supra] to determine height" in light of the angle of the camera. Thereafter, the defendant called Garneau as a witness at trial, and his testimony covered both of these points.

"The permission to perform or make experiments or illustrations in the presence of the jury rest[s] in the sound judicial discretion of the trial judge." Commonwealth v. Chin

_____

[9] In admitting this video, the judge reasoned that the height chart provided a measurement of distance from the floor of the store as it existed just prior to trial and, given that the Commonwealth had introduced into evidence a measurement from that same floor to a bolt on the store's doorframe, fairness required the admission of the height chart video.

Kee, 283 Mass. 248, 260 (1933), and cases cited.  See

Commonwealth v. Makarewicz, 333 Mass. 575, 592 (1956).

"Although it must appear that the conditions or circumstances

were in general the same in the illustrative case and the case

in hand, . . . the determination whether the conditions were

sufficiently similar to make the experiments of any value in

aiding the jury is a matter resting in the sound discretion of

the judge" (citation omitted).  Id. at 592-593, quoting Guinan

v. Famous Players-Lasky Corp., 267 Mass. 501, 521-522 (1929).

See Commonwealth v. Flynn, 362 Mass. 455, 473 (1972), quoting

Field v. Gowdy, 199 Mass. 568, 574 (1908) (trial judge has

discretion to determine "[w]hether the conditions were

sufficiently similar to make the . . . [experiment or

demonstration] of any value in aiding the jury to pass upon the

issue submitted to them").  A judge's decision concerning the

similarity of the experiment's conditions to those of the

original incident "will not be interfered with unless plainly

wrong."  Flynn, supra, quoting Field, supra.

    Evidence at trial supported the judge's finding that there

was an insufficient showing that the floor level and

surveillance camera positioning at the store were the same

during Garneau's videotaping and the robbery.  Although it would

not have been an abuse of discretion for the judge to have

permitted the introduction of the superimposed video and

accompanying explanation by the expert, we cannot say it was an abuse to exclude it.[10]  More importantly, even assuming for argument that the exclusion constituted error, it was not prejudicial because Garneau was permitted to, and did, testify concerning the purpose of the height chart and to the substantive points that the video was intended to illustrate: the inaccuracy of using an elevated camera angle to judge the height of something in relation to the height of a fixed object, and a camera angle's distorting effect on the images the camera captures.  See Commonwealth v. Smith, 460 Mass. 385, 398 (2011) (exclusion of evidence did not prejudice defendant where it was cumulative of admitted evidence).  These concepts were not of such complexity that the excluded video was needed to elucidate Garneau's testimony for the jury.  Moreover, in his closing, the prosecutor did not seek to argue that the surveillance video demonstrated that the perpetrator's height corresponded to that

_____

[10] The defendant cites several cases to support his argument that any differences between the conditions of an experiment and the conditions of the original incident "affect the weight of the [experiment] evidence and not its admissibility."  See Calvanese v. W.W. Babcock Co., 10 Mass. App. Ct. 726, 730-731 (1980); Bechtel v. Paul Clark, Inc., 10 Mass. App. Ct. 685, 688-689 (1980).  See also Commonwealth v. Ellis, 373 Mass. 1, 5 (1977).  In each of these cases, however, the trial judge had exercised discretion to allow evidence of an experiment.  Accordingly, the defendant's argument does not alter the legal landscape that affords a trial judge discretion to exclude evidence of an experiment due to the different conditions present during the experiment.  See Commonwealth v. Flynn, 362 Mass. 455, 473 (1972).

of the defendant.  The judge's exclusion of the expert's video did not infringe on the defendant's right to present a defense.

5.  G. L. c. 278, § 33E.  After review of the entire record pursuant to G. L. c. 278, § 33E, we find no basis on which to grant the defendant relief.

Judgments affirmed.