NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11579


COMMONWEALTH  vs.  XZENIYEJU CHUKWUEZI.



Suffolk.    February 12, 2016. - September 29, 2016.

Present:  Gants, C.J., Spina, Botsford, Duffly, & Lenk, JJ.[1]


Homicide.  Firearms.  Evidence, Computer simulation, Prior
    consistent statement, Alibi.  Alibi.  Constitutional Law,
    Sentence.  Practice, Criminal, Instructions to jury,
    Argument by prosecutor, Sentence, Capital case.



Indictments found and returned in the Superior Court
Department on July 1, 2009.

The cases were tried before Linda E. Giles, J.


Stephen Paul Maidman for the defendant.
Zachary Hillman, Assistant District Attorney, for the
Commonwealth.


LENK, J.  The defendant was convicted by a Superior Court

jury of murder in the first degree on a theory of deliberate

premeditation, and of unlawful possession of a firearm, in

_____

[1] Justices Spina and Duffly participated in the deliberation
on this case prior to their retirements.

connection with the 2009 shooting death of Soheil Turner, a fifteen year old boy.  The defendant was eighteen years old at the time of the shooting.  On appeal, the defendant argues that the trial judge abused her discretion in excluding from evidence a computer-generated simulation that was intended to assist the jury in determining the shooter's height.  He also asserts error in several other respects, described in greater detail below, and seeks relief under G. L. c. 278, § 33E.  Having reviewed the entire record, we affirm the convictions and discern no reason to exercise our authority to grant extraordinary relief.

1.  <u>Background and procedural posture</u>.  We recite the facts the jury could have found, reserving certain details for later discussion.  At approximately 7:20 <u>A</u>.<u>M</u>. on May 7, 2009, Turner was shot in the back of the head and in the right shoulder while waiting for a school bus in the Roxbury section of Boston.  He died later that day as a result of the shooting.  Police recovered two shell casings from the scene of the shooting that appeared to have been fired from a semiautomatic firearm.

Several video surveillance cameras recorded the shooting and the surrounding circumstances.[2]  Shortly after 7 <u>A</u>.<u>M</u>. on the morning of the shooting, the shooter, an African-American male

---

[2] Police obtained video recordings from three surveillance cameras in the vicinity of the shooting.  None of the recordings was of sufficient quality to allow for identification of the shooter.

carrying a yellow umbrella, walked north on Adams Street from the direction of Forest Street, and stopped at the northeast corner of Dudley Street and Adams Street.  The shooter was wearing a black hooded sweatshirt with the hood up, and a loose fitting T-shirt and pants.  A few minutes later, a young woman, later identified as Amari Figueroa, arrived at the southeast corner of the intersection, talking on her cellular telephone.  She and the shooter waved to each other.  Shortly thereafter, Turner arrived in the area and went into a convenience store on Dudley Street near the southwest corner of the intersection.  After Turner returned outside, the shooter walked diagonally across the intersection towards him, and stood with him in front of the store.  The two had a short conversation.  The shooter then drew a gun that he had been concealing and shot Turner twice.  The shooter ran around the corner onto Adams Street, tucking the gun into his waist area as he did so, then ran up the east side of Adams Street and out of view.

Figueroa eventually told police that the person she had waved to on the morning of the shooting was the defendant.  She had known the defendant for several years, socialized with him occasionally, and lived two houses away from him on Forest Street, a short walk from the intersection where the shooting took place.  After hearing the gunshots, Figueroa saw the defendant "speed walking" down Adams Street in the direction of

Forest Street.[3] She then telephoned 911. At some point in the weeks after the shooting, Figueroa met with the defendant and asked him why he shot Turner. The defendant told her that a fifteen year old recently had shot and injured one of his friends. The defendant explained that "[i]f he didn't kill [Turner] then he was going to be next." The defendant also urged her not to say anything to police.

Other witnesses corroborated Figueroa's testimony about the shooting. Raymona Hartepps walked out of the convenience store shortly before the shooting, and overheard part of the shooter's brief conversation with Turner. She recalled hearing Turner ask the defendant where he was from and what his name was.[4] As soon as Hartepps had walked past the store, she heard two gunshots, and saw the shooter run around the corner onto Adams Street in the direction of Forest Street, tucking a black object into his right pocket. Isaiah Grant also saw the shooter run down Adams Street onto Forest Street. Grant further observed the shooter run up a set of steps and around to the right side of a duplex house on Forest Street. The defendant, who was in high school

---

[3] Forest Street is at the southern end of Adams Street, and perpendicular to it.

[4] The shooter identified himself as either "Jonathan from Wayne Wood" or "Robert from Norwood."

at the time, lived with his family on the right side of that house.

On July 1, 2009, a grand jury returned two indictments, charging the defendant with murder in the first degree, G. L. c. 265, § 1, and unlawful possession of a firearm, G. L. c. 269, § 10 (a). The defendant's theory of the case was one of mistaken identity. He sought to impeach Figueroa's credibility on cross-examination, and called alibi witnesses. The defendant's mother and younger brother both testified that the defendant was at home getting ready for school at the time of the shooting. The defendant also testified in his own defense, stating that he did not shoot Turner. In addition, the defendant sought unsuccessfully to introduce a computer-generated simulation in evidence.

On October 19, 2010, the jury found the defendant guilty of murder in the first degree on a theory of deliberate premeditation.[5] They also found him guilty of unlawful possession of a firearm. The defendant was sentenced to life in prison without the possibility of parole for the conviction of murder in the first degree, and to a term of from four to five

---

[5] The jury were instructed with respect to murder in the first degree both on the theory of deliberate premeditation and on the theory of extreme atrocity or cruelty. They also were instructed on murder in the second degree.

years of incarceration for the conviction of unlawful possession of a firearm, to run concurrently. This appeal followed.

2. Discussion. The defendant argues that the judge erred with respect to several evidentiary rulings: excluding the computer-generated simulation from evidence; admitting testimony that the Commonwealth offered as a prior consistent statement by Figueroa; and allowing the Commonwealth to impeach an alibi witness for not volunteering his knowledge about the defendant's whereabouts to police, without providing appropriate instructions on alibi to the jury. The defendant further argues that the Commonwealth improperly invoked sympathy for the victim's family during its closing argument. Moreover, the defendant contends that he should not have been sentenced to life in prison without the possibility of parole because he was only eighteen at the time of the shooting. The defendant also seeks relief under G. L. c. 278, § 33E.[6]

---

[6] In addition, the defendant asserts error in the judge's decision to permit Figueroa, over objection, to enter the court room through a side door in the presence of the jury, rather than via the main door used by other witnesses. The defendant asserts that that decision violated his constitutional rights to due process and a fair trial because it intimated to the jury that he was "a bad and dangerous person whose guilt [could] be virtually assumed." See Commonwealth v. Brown, 364 Mass. 471, 475 (1973). That argument is without merit, because there is no evidence in the record that the jury would have understood a witness's method of entry into the court room to be related to the defendant's dangerousness, thereby creating an unacceptable risk of prejudice against him. See id. at 476 (burden is on

a.  Computer-generated simulation.  Whether the shooter was the same height as the defendant was a matter of dispute at trial.[7]  To aid the jury in making that determination, the defendant commissioned a computer-generated simulation of the crime scene, based on two photographs from the surveillance camera closest to the shooting,[8] in which the shooter was standing relatively upright on a level surface.[9]

---

defendant to show judge's decision in imposing security measure was "arbitrary or unreasonable").

[7] Immediately after the shooting, Figueroa told police that the shooter was six feet, one inch tall, while other witnesses stated that he was five feet, nine inches tall.  The defendant's height around the time of the shooting was not measured, but police estimated that he was between five feet, eleven inches and six feet tall.  Photographs taken at the time of the defendant's arrest similarly indicate that he was approximately six feet tall.

[8] The video recording comprised a series of time-lapsed photographs.

[9] An engineer identified fixed points in the background of the photographs, and visited the crime scene in person to measure their locations relative to each other and to the camera.  A graphic designer then used those measurements and computer software to create a three-dimensional virtual model of the crime scene.

Although the judge did not make an explicit finding that the camera continued to be positioned in the same place and at the same angle at the time the measurements were taken as at the time of the shooting, we infer this fact from testimony at the voir dire hearing that the camera was "locked down" and "mounted to a wall," from photographs of the camera's location that were admitted in evidence, and from the Commonwealth's decision to point out the location of the camera during a view of the crime scene.

Using principles of photogrammetry,[10] the simulation superimposed human-shaped figures of increasing height over the shooter as he appeared in the photographs.  The figures were to scale with the photographs, and were shown standing rigidly upright, wearing hooded sweatshirts with the hoods up.  They increased in height in one inch increments from five feet, nine inches to six feet, as measured from the soles of their feet to the tops of their hoods.  In effect, the simulation attempted to facilitate a comparison between actual height of the figures and the shooter's apparent height in the photographs.  The Commonwealth filed a motion in limine to exclude it from evidence on the ground that it was misleading.

i.  <u>Voir dire</u>.  The judge conducted a voir dire hearing at which she questioned the graphic designer who produced the simulation, an engineer, and a forensic photographer who worked for the Federal Bureau of Investigation (FBI).  The graphic designer described in detail how he had produced the simulation.  At the judge's request, he used the simulation to estimate that the shooter was between five feet, nine inches and five feet,

---

[10] "Photogrammetry is the process of obtaining information, usually measurements, from images" (citation omitted).  Edmond, Cole, Cunliffe, & Roberts, Admissibility Compared:  The Reception of Incriminating Expert Evidence (i.e., Forensic Science) in Four Adversarial Jurisdictions, 3 U. Denv. Crim. L. Rev. 31, 50 n.156 (2013).

ten inches tall -- several inches shorter than the defendant, by most accounts.[11]

The engineer testified that he was familiar with two techniques for assessing a suspect's height from a video recording.  The first technique was the one the graphic designer had used.  The second technique, which the judge referred to as a "height analysis," involved directly measuring the suspect's height from the video recording, and could take the suspect's posture into account.  This second technique, however, required using high-quality video footage from multiple camera angles; such footage was not available.  The forensic photographer who worked for the FBI described a third technique that similarly could account for a suspect's posture.[12]  In the forensic photographer's opinion, the defendant's simulation was misleading because it compared rigid figures with a person of normal posture.

In light of this testimony and her own viewing of the simulation, the judge concluded that the simulation was "hopelessly misleading."  She noted that the jury generally

---

[11] See footnote 7, supra.

[12] The third technique involved placing a person whose height was known next to a ruler in roughly the same place as the suspect was standing at the time of the crime.  By using the same camera that recorded the crime to recreate the scene, the technique allowed forensic investigators to take a suspect's posture into account in estimating his or her height.

should be allowed to consider simulation evidence "in a close case," and suggested that a "height analysis" in accordance with one of the other techniques described might have been admissible. Nonetheless, she expressed concern that the simulation would confuse the jury into thinking that the shooter, who was not standing as rigidly upright as the computer-generated figures, was shorter than he actually was. She declined to allow its admission in evidence, over the defendant's objection.

ii. Review for abuse of discretion. The defendant argues that the judge's evidentiary ruling deprived him of a meaningful opportunity to present a complete defense, a right guaranteed by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. See Pixley v. Commonwealth, 453 Mass. 827, 834 (2009). That right, however, is not unfettered; it is subject to the limitations set forth under standard rules of evidence. See Montana v. Egelhoff, 518 U.S. 37, 42 (1996), and cases cited. In determining whether to admit a computer-generated simulation like the one at issue here, a trial judge must determine whether the simulation is relevant evidence; whether the simulation's conditions correspond to those of the original incident, see Commonwealth v. Corliss, 470 Mass. 443, 456 (2015); and whether the evidence will confuse or mislead the jury. See Commonwealth

v. Rosa, 422 Mass. 18, 25 (1996); Lally v. Volkswagen Aktiengesellschaft, 45 Mass. App. Ct. 317, 332 (1998).

Although "[w]e have consistently held that lower court findings based on documentary evidence available to an appellate court are not entitled to deference," Commonwealth v. Novo, 442 Mass. 262, 266 (2004), S.C., 449 Mass. 84 (2007), the judge's decision in this case was based both on her viewing of the simulation itself and on witnesses' explanations of the simulation during the voir dire hearing. We therefore review the judge's decision to exclude the simulation for abuse of discretion. See Commonwealth v. McGee, 469 Mass. 1, 9 (2014).[13]

The defendant argues that the judge did not understand that the figures were created precisely to scale based on principles of photogrammetry, and could be presented with any desired height or posture. In his view, the Commonwealth would have had the opportunity to emphasize on cross-examination and during its closing argument that the figures were standing rigidly upright

---

[13] But see Commonwealth v. Scott, 470 Mass. 320, 327 (2014) (reviewing judge's decision to exclude third-party culprit evidence "independently" and under "a standard higher than that of abuse of discretion" because of "[the] constitutional dimension" of exclusion of such evidence [citations omitted]). Because the defendant sought to use the simulation to call into question whether he was the same height as the shooter, and not to identify specifically another person as the culprit, the higher standard does not apply in this case. See Commonwealth v. Silva-Santiago, 453 Mass. 782, 800-801 (2009) (defining third-party culprit evidence).

while the shooter was not, so there was no danger that the jury would be misled or confused. The defendant further argues that the simulation should have been admitted because it was highly relevant to the identity of the shooter, a "central issue in the case." See Commonwealth v. Jaime, 433 Mass. 575, 579 (2001). Accordingly, he contends that the judge abused her discretion in excluding the simulation.

We do not agree. In Commonwealth v. Corliss, supra at 456, in considering a simulation produced by the graphic designer who was involved in this case, we determined that it was an appropriate exercise of judicial discretion to exclude that simulation from evidence. We deferred to the trial judge's finding that the defendant had not proved satisfactorily that the simulation's conditions matched those of the incident being simulated.[14] Id. Similarly here, we cannot say the judge made "a clear error of judgment in weighing the factors relevant to the decision, . . . such that the decision [fell] outside the range of reasonable alternatives" (quotations and citations

---

[14] There was evidence in that case suggesting that the surveillance camera that had recorded the incident had been moved during a renovation after the incident, and that the level of the floor also had been changed. See Commonwealth v. Corliss, 470 Mass. 443, 455 (2015).

omitted).  See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), and cases cited.[15]

The judge's determination was not, as the defendant contends, based on a misunderstanding of the principles of photogrammetry.  Rather, the judge concluded reasonably that the simulation could not be explained with sufficient clarity to avoid confusing the jury, and did not take into account important factors that would have affected the shooter's apparent height.  By the judge's own account, it took her "almost an hour . . . to figure [out] what [the graphic designer] [was] saying."  Furthermore, it is evident that the "height analysis by comparison" that the simulation facilitated was inexact at best.  The photographs used in the simulation showed the shooter wearing loose-fitting clothing and a hood that obscured his posture and the location of the top of his head.  In one of the photographs, the shooter appeared to be mid-stride.  In the other, the shooter may have been hunched or leaning forward under his umbrella.  In both, the shooter was addressing a victim who was only five feet, four inches tall, and thus was likely to be tilting his head downward.  In light

---

[15] Cf. Commonwealth v. Caruso, 85 Mass. App. Ct. 24, 32-33 (2014) (judge declined to admit simulation created by graphic designer as newly discovered evidence, and questioned simulation's ability accurately to establish suspect's height).

of these concerns, the judge did not abuse her discretion in excluding the simulation.

Moreover, even if the exclusion had constituted error, it would not have been prejudicial.  See Commonwealth v. Corliss, supra at 456-457.  While the defendant's height around the time of the shooting was not measured, most estimates placed him between five feet, eleven inches and six feet tall.  The jury also may have been able to assess for themselves the defendant's height at the time of trial.[16]  Eyewitnesses placed the shooter's height within a narrow range, from five feet, nine inches tall to six feet, one inch tall.  In addition, one of the surveillance videos showed Hartepps, who was five feet, nine inches tall, walk past the shooter, allowing the jury to compare their apparent heights.  In his closing argument, defense counsel discussed at length the possible difference between the defendant's height and the shooter's.  Given that the Commonwealth would have explored the limitations of a "height analysis by comparison" on cross-examination, the simulation was unlikely to have supplemented the other evidence of the shooter's height in any meaningful way.  Cf. Commonwealth v. Perito, 417 Mass. 674, 684 (1994) (judge did not abuse

---

[16] The record does not indicate whether the defendant, then a teenager, grew in height between May 7, 2009, and his trial in October, 2010.

discretion in concluding that failure to produce low-quality video recording of suspect's height and build did not prejudice defendant where same information was available from eyewitness).

b. Prior consistent statement. Although she had had several earlier opportunities to do so, Figueroa did not tell police that the defendant was the shooter until they interviewed her on May 19, 2009.[17] At trial, Figueroa explained that she initially declined to identify the defendant because she was concerned for her safety. During cross-examination, however, the defendant elicited testimony that police had told Figueroa during an interview on May 8, 2009, that they thought she knew more about the shooting than she had disclosed; that police told Figueroa during that interview that they would require her to testify before the grand jury, where lying would constitute perjury; and that by May 8, 2009, Figueroa believed that people in the community were aware that she had seen the shooting. The Commonwealth then introduced, over objection, testimony from Figueroa's mother that Figueroa had confided in her on the night of May 7, 2009, that "[s]omeone had got shot and she knew who

---

[17] When interviewed at the scene immediately after the shooting on May 7, 2009, and at the police station later that day, Figueroa told police that she did not recognize the shooter. During an interview on the evening of May 8, 2009, however, Figueroa learned that police believed she had waved to the shooter shortly before the shooting. When police asked her at that interview whether she knew who the shooter was, she responded that she wanted to "pass the question."

did it," and that the shooter lived "[t]wo houses down" from them. The defendant argues that Figueroa's mother's testimony should not have been admitted.

"A witness's prior statement that is consistent with that witness's trial testimony is usually inadmissible" (citation omitted). Commonwealth v. Novo, 449 Mass. 84, 93 (2007). If, however, a judge

> "makes a preliminary finding that there is a claim that the witness's in-court testimony is the result of recent contrivance or a bias, and the prior consistent statement was made before the witness had a motive to fabricate or the occurrence of the event indicating a bias, the evidence may be admitted for the limited purpose of rebutting the claim of recent contrivance or bias."

Mass. G. Evid. § 613(b)(2) (2015). See Mass. G. Evid. § 613 note, at 215, citing Commonwealth v. Novo, 449 Mass. at 93.

Here, the judge found that the defendant had claimed that Figueroa's identification of him as the shooter was the result of recent contrivance or bias, because the defendant had suggested on cross-examination that Figueroa felt pressure from both police and the community falsely to identify a specific individual as the shooter.[18] The defendant does not contest that

---

[18] The jury were not instructed regarding the proper use of the prior consistent statement. Because the defendant did not request such an instruction, however, there was no substantial likelihood of a miscarriage of justice. See Commonwealth v. Rivera, 430 Mass. 91, 100 (1999) ("While the defendant was entitled, on request, to a limiting instruction, there is no

finding. Nonetheless, he argues that Figueroa's motive to fabricate already existed before she told her mother, on the night of May 7, 2009, that the shooter was their neighbor, because she would have felt pressure from the community to identify someone immediately after the shooting earlier that day.

Police did not mention the possibility of criminal prosecution for perjury, however, until May 8, 2009, the day after Figueroa confided in her mother. Thus, the mother's testimony properly was admitted as a prior consistent statement to counter the defendant's suggestion of police pressure. See Commonwealth v. Andrews, 403 Mass. 441, 455 (1988); Commonwealth v. Mayfield, 398 Mass. 615, 629-630 (1986). Given this conclusion, we need not consider when Figueroa's other supposed motive to fabricate, pressure from the community, first arose.

c. Alibi witness. The defendant called his younger brother, Cjaillon Andrade, to testify as an alibi witness that he had seen the defendant at home getting ready for school at the time of the shooting. Over objection, the Commonwealth impeached Andrade's testimony on cross-examination on the ground that Andrade had not reported this alibi to police. The defendant argues that the judge should not have allowed this

substantial likelihood of a miscarriage of justice because the judge did not give such an instruction sua sponte").

impeachment.  In addition, the defendant argues that the jury instructions regarding alibi witness testimony were incorrect.

Because "[a] person ordinarily has no legal obligation to provide exculpatory information to the police," Commonwealth v. Hart, 455 Mass. 230, 238 (2009), the Commonwealth may impeach a witness for failing to provide such information only if it establishes a sufficient foundation.  We previously have required the Commonwealth to establish "[1] that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information, [2] that the witness had reason to make the information available, [and] [3] that he was familiar with the means of reporting it to the proper authorities."  Commonwealth v. DaSilva, 471 Mass. 71, 82 (2015), quoting Commonwealth v. Hart, supra.  The defendant concedes that the Commonwealth established each of these facts, but argues that the judge additionally should have considered that police were aware that Andrade might have relevant information, yet never contacted him.[19]  In the defendant's view, this additional consideration would have led the judge to conclude that the impeachment of Andrade was unfairly prejudicial.

---

[19] Police knew from speaking with the defendant's mother that Andrade had been at home with her on the morning of the shooting.

In Commonwealth v. Hart, supra, we noted that there are some circumstances "in which it would not be natural for a witness to provide the police before trial with exculpatory information," including when the witness "thinks that [his or] her information will not affect the decision to prosecute."  It is possible that Andrade assumed as much; he was still a teenager at the time the defendant was accused, and testified that he believed police "probably" had spoken with his mother when they executed a search warrant, providing them with the same alibi that was the subject of his testimony.  Nonetheless, the defendant had an opportunity to rehabilitate the Commonwealth's efforts at impeachment by eliciting this information from Andrade on redirect, and did so effectively.  No more was required to protect against the possibility of prejudice.  See id. at 242 ("If the impeachment evidence is admitted, the defendant is free to elicit on redirect examination the witness's reason for prior silence").

The defendant's arguments regarding jury instructions pertaining to alibi witnesses similarly are without basis.  He argues that the judge should have sustained his objection to the judge's instruction that, in considering the credibility of a given witness, the jury could consider "whether or not he or she has any interest in the outcome of the case."  Although the contested instruction might have been problematic if it had

targeted specifically the credibility of only the defendant's alibi witnesses, it was included within a long list of standard factors that the jury could consider in assessing any witness's credibility. Because "[t]he charge was a general comment, stated an obvious point, and did so only once," it was not error. See Commonwealth v. Roderick, 411 Mass. 817, 821 (1992).

It also was not error for the judge to deny the defendant's request for an instruction that the Commonwealth had the burden of disproving the defendant's alibi. "[J]udges are not required to deliver their instructions in any particular form of words, so long as all necessary instructions are given in adequate words." Commonwealth v. Sinnott, 399 Mass. 863, 878 (1987). Here, the judge instructed the jury "that the Commonwealth has the burden of proving beyond a reasonable doubt that the Defendant committed the offense as charged," which included "proving that the Defendant was present at the scene and not somewhere else at the time." She added, "[I]f you have a reasonable doubt about whether the defendant was present at the time and place of the offenses, or about any other element of the crimes, then you must find him not guilty." These instructions conformed with the model instruction on alibi then in effect, see Instruction 9.120 of the Criminal Model Jury Instructions for Use in the District Court (2009), and

adequately described the burden the defendant sought to emphasize in his requested instruction.

The defendant also argues, for the first time on appeal, that the jury should have been instructed that a person has no obligation to provide exculpatory information to police. See Commonwealth v. Hart, supra at 238. Recognizing that "[o]rdinarily judges are not required, sua sponte, to instruct juries as to the purposes for which evidence is offered at trial," Commonwealth v. Roberts, 378 Mass. 116, 126 (1979), S.C., 423 Mass. 17 (1996), we discern no error in the absence of such an instruction.

d. Closing argument. The defendant contends that the Commonwealth improperly invoked the jury's sympathy during closing argument. Over objection, the Commonwealth described the victim's family as being "summoned to the hospital that morning after he was shot, forced to bear witness to the [carnage] that this man [inflicted] on his body." The judge declined to give a requested curative instruction. In the defendant's view, the Commonwealth's closing placed too much emphasis on the suffering of the victim's family, and deprived him of his Federal and State constitutional rights to due process and a fair trial.

A prosecutor "should not play on the sympathy or emotions of the jury," but is entitled to "tell the jury something of the

person whose life [has] been lost in order to humanize the proceedings" (citations omitted).  Commonwealth v. Rodriguez, 437 Mass. 554, 566 (2002).  Although the Commonwealth's reference to the "carnage" witnessed by the victim's family likely invoked some sympathy, it was presented as part of a broader, humanizing description of the victim's life.[20]  In context, the statement was not the "focal point" of the Commonwealth's argument, and was not excessive.  See id. at 567.  In any event, the jury were instructed to "confine [their] deliberations to the evidence and nothing but the evidence," to "determine the facts based solely on a fair consideration of the evidence," and "not to be swayed by prejudice or sympathy."  These instructions helped to ensure that any sympathy the jury felt for the victim's family did not influence their decision.

_____

[20] The prosecutor stated in full,

"Soheil Turner was a son, a grandson, a nephew and a friend to many people.  Because of the actions of this Defendant he is none of those things anymore.

"Forever fifteen years old, the lasting image of his short life will be standing innocently, defenseless and unaware.  A school kid waiting at his bus stop and eating his honey bun.  Unaware that his executioner was waiting across the street and watching.  Unaware that in moments his life was going to end on the morning of May 7th of 2009 as he waited for his school bus.

"His family summoned to the hospital that morning after he was shot, forced to bear witness to the [carnage] that this man [inflicted] on his body."

Cf. Commonwealth v. Camacho, 472 Mass. 587, 608-609 (2015) (context of summation, evidence at trial, and jury instructions prevented improper closing from creating substantial likelihood of miscarriage of justice).

e. Sentence of life without the possibility of parole. The defendant received the statutorily required sentence of life in prison without the possibility of parole for his conviction of murder in the first degree. See G. L. c. 265, § 2, as amended by St. 2014, c. 189, § 5 (providing parole eligibility for person convicted of murder in first degree only if person was younger than eighteen at time of offense). The defendant argues that this sentence is unconstitutionally disproportionate to his crime because he was only eighteen years old at the time of the shooting.[21] The age of eighteen, however, "is the point where society draws the line for many purposes between childhood and adulthood." Roper v. Simmons, 543 U.S. 551, 574 (2005).

---

[21] The defendant also argues that his sentence violates his rights to equal protection under both the United States Constitution and the Massachusetts Declaration of Rights, because of his age at the time of the shooting. That argument is without basis, as there is a rational basis for making determinations of parole eligibility based on age, and age is not a suspect classification requiring heightened scrutiny. See Commonwealth v. Weston W., 455 Mass. 24, 30 (2009). See also Commonwealth v. Freeman, 472 Mass. 503, 508 (2015) ("We have repeatedly said that those who challenge the constitutionality of a statute that does not burden a suspect group or a fundamental interest carry a heavy burden in seeking to overcome the statute's presumption of constitutionality" [quotations and citations omitted]).

That such line-drawing may be subject "to the objections always raised against categorical rules," id., does not itself make the defendant's sentence unconstitutional.

f.  Relief pursuant to G. L. c. 278, § 33E.  We have examined the record carefully pursuant to our duty under G. L. c. 278, § 33E,[22] and discern no basis on which to grant the defendant extraordinary relief.

Judgments affirmed.

---

[22] We note that, during cross-examination by the defendant, one of the detectives who executed a search warrant to search the defendant's house testified that a rifle was seized from the house.  That testimony was not relevant to the charges before the jury, and had the potential to lead them to believe that the defendant had a propensity for violence or was affiliated with a gang.  Nonetheless, the defendant elicited from the detective that there was no indication that the rifle "had anything to do with" him, and the judge properly instructed the jury that the charge of unlawful possession of a firearm referred only to a semiautomatic handgun, not a rifle.  Thus, it did not create a substantial likelihood of a miscarriage of justice.