SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. TRAVIS PHILLIPS

 
 Docket:
 SJC-13350
 
 
 Dates:
 November 8, 2024 - March 13, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Wendlandt, Dewar, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Homicide. Firearms. Practice, Criminal, Argument by prosecutor, Opening statement, Motion to suppress, Presumptions and burden of proof, Warrant, Affidavit, Instructions to jury, Capital case. Evidence, Videotape, Identity, Argument by prosecutor, Presumptions and burden of proof. Search and Seizure, Warrant, Probable cause. Probable Cause. License.
 
 

             Indictments found and returned in the Superior Court Department on October 12, 2018.
            A pretrial motion to suppress evidence was heard by Christine M. Roach, J., and the cases were tried before Robert L. Ullmann, J.
            Jeffrey L. Baler for the defendant.
            Erin Knight, Assistant District Attorney (Craig Iannini, Assistant District Attorney, also present) for the Commonwealth.
            WOLOHOJIAN, J.  After a jury trial, the defendant was convicted of murder in the first degree, G. L. c. 265, § 1, of Deondra Lee on the theories of deliberate premeditation and of extreme atrocity or cruelty, and of possessing a firearm without a license, G. L. c. 269, § 10 (a).  The defendant raises several arguments in this direct appeal from his convictions.  First, he argues that the evidence was insufficient to prove beyond a reasonable doubt that he was the person who committed the offenses.  Second, he contends that the prosecutor impermissibly appealed to emotion, misstated the evidence, and reduced the Commonwealth's burden of proof in his opening statement and closing argument.  Third, the defendant argues that the judge erred in denying his motion to suppress evidence recovered from a search of his mother's apartment because the warrant application did not establish probable cause that the defendant was involved in the offenses or that there was a sufficient nexus to his mother's apartment.  Fourth, he argues that the judge's use of the pre-Commonwealth v. Castillo, 485 Mass. 852 (2020), model instruction regarding extreme atrocity or cruelty resulted in a substantial likelihood of a miscarriage of justice.  Fifth, the defendant argues that the jury should have been instructed that the Commonwealth bore the burden of proving beyond a reasonable doubt that he did not have a firearms license and that there was insufficient evidence to establish that fact.  Finally, the defendant asks that we order a new trial or reduce the verdict of murder in the first degree pursuant to our authority under G. L. c. 278, § 33E.  Because the jury should have been instructed that the Commonwealth had the burden to prove that the defendant did not have a valid firearms license, we vacate the conviction of unlawful possession of a firearm and remand for a new trial on that charge.  We otherwise affirm.  
            Background.  For purposes of assessing the defendant's challenges to the sufficiency of the evidence, we recite the evidence in the light most favorable to the Commonwealth.  See Commonwealth v. Bonner, 489 Mass. 268, 269 (2022).  Much of the evidence at trial consisted of videotapes (and still images from those videotapes) recorded by pole cameras, Massachusetts Bay Transportation Authority (MBTA) buses, and private building security cameras, which captured not only the shooting, but also events preceding and following it.  
            On the evening of July 4, 2018, Lee (victim) and his wife were sitting in lawn chairs at the corner of Dacia and Brookford Streets in Boston in order to watch the fireworks.  At around 9:47 P.M., a gray, four-door Volkswagen Passat with a moonroof, a roof rack without cross bars, a bent antenna, a white spot on the roof, and missing center insignia on the rear driver's side wheel trim, passed by the seated couple.  The car was registered to one Raquel Lamons, whose boyfriend was the codefendant, Michael Carleton.[1]  Lamons and Carleton lived together, and they both were connected to the defendant.  On this particular night, Carleton, who is Black, was driving the Volkswagen while wearing a distinctive dark-colored shirt with an orange and white "Airmax" logo on it.  The passenger, who was also Black, wore a white T-shirt with a yellow marking on the chest.
            After making its initial pass by the victim and his wife, the car then circled around the block.  Shortly before again reaching the corner where the victim and his wife sat, Carleton pulled the Volkswagen over to allow the car behind it to pass.  Once the road was clear of cars, Carleton again drove past the victim and his wife.  This time, as Carleton braked to slow the car, the passenger, using a laser guide trained on the victim, fired multiple shots through the lowered passenger's side window of the moving car.  At least three of those gunshots struck the victim as intended:  one bullet struck him in the back of his head, went through the occipital lobe of his brain, crossed through the cerebellum, right temporal and parietal lobes, and then emerged through his left cheek.  The victim was also shot in his left foot and his right leg.[2]
            The Volkswagen then proceeded to a parking lot located behind a building located at 630 Dudley Street, where it arrived approximately one minute after the shooting, at 9:49 P.M.  This was a private parking lot dedicated to residents with a parking sticker, which the Volkswagen did not have.  The shooter, still wearing the white T-shirt with the yellow marking on its chest, got out of the car and closed the door behind him using his left hand and leaving behind prints from his palm, left ring finger, and left pinky finger.  These prints belonged to the defendant.  And they were not the only forensic evidence connecting the defendant to the Volkswagen.  Specifically, the defendant was the major contributor of deoxyribonucleic acid (DNA) found on a water bottle in the center console to the left of the passenger seat in which the shooter had sat.  The defendant's DNA characteristics were represented as the major contributor across all twenty-four tested locations of the DNA obtained from the swab taken of the water bottle.  The combination of DNA characteristics obtained from the swab would be expected to occur in the general population in one in 12 octillion African-Americans, one in 19 nonillion Caucasians, and one in 5.29 nonillion Hispanics.[3]  As we have already noted, the defendant is Black.
            After he got out of the car, the shooter walked through an alleyway and directly to an adjacent four-unit apartment building at 626 Dudley Street.  The defendant's mother lived in this building, and the defendant had been seen frequently at his mother's apartment by the building superintendent.  The superintendent had also seen the defendant as a passenger in a Volkswagen on various occasions.  On those occasions, the Volkswagen had been parked on the street in front of the mother's building.
            Within a minute or two after the shooter entered the defendant's mother's apartment building, he re-emerged -- this time wearing a white brimmed hat he had not been wearing before.  He walked across the street to a park.  Later, wearing the white brimmed hat, the white T-shirt with yellow markings on the chest, and white sneakers, the shooter returned to the defendant's mother's residence, where white-colored men's sneakers consistent with those worn by the shooter were later recovered pursuant to a search warrant executed at the mother's apartment.  Lamons (the owner of the Volkswagen) was at the defendant's mother's apartment when police executed the search warrant.
            Pursuant to another search warrant, police subsequently searched Carleton's cell phone and discovered that it contained a photograph of the defendant.  The "metadata" associated with the photograph showed that it had been taken at 10:28 P.M. on May 5, 2018, i.e., two months before the murder.  See Commonwealth v. Cronin, 495 Mass. 170, 175 n.12 (2025) ("Metadata is data 'that describes other data, as in describing the origin, structure or characteristics of computer files, webpages, databases, or other digital resources.'  American Heritage Dictionary of the English Language 1105 [5th ed. 2018]").  The metadata also showed the global positioning system coordinates for the location at which the photograph was taken.  Those coordinates corresponded to "approximately" 622 Dudley Street.  The picture showed the defendant standing inside the entryway of what appears to be a residential building with four mailboxes.
            Discussion.  1.  Sufficiency of evidence of identity.  The defendant moved for a required finding of not guilty at the close of the Commonwealth's case and again at the close of evidence, contending that there was insufficient evidence to permit the jury to find beyond a reasonable doubt that he was the shooter.  He makes this same argument to us.  "In reviewing the sufficiency of the evidence, '[w]e consider whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'"  Commonwealth v. Shakespeare, 493 Mass. 67, 80 (2023), quoting Commonwealth v. Watson, 487 Mass. 156, 162 (2021).  The evidence supporting a conviction may be exclusively circumstantial, and "we draw all reasonable inferences in favor of the Commonwealth."  Watson, 487 Mass. at 162, quoting Commonwealth v. Ayala, 481 Mass. 46, 51 (2018).  "[T]he inferences a jury may draw from the evidence 'need only be reasonable and possible and need not be necessary or inescapable.'"  Shakespeare, 493 Mass. at 80, quoting Commonwealth v. Whitaker, 460 Mass. 409, 416 (2011).
            The jury were able to observe the defendant sitting in the court room before them, and to compare his appearance with the photograph of the defendant on Carleton's cell phone, the booking photographs of the defendant taken shortly after the shooting, and the images (video and still) of the shooter on the night of the murder.  The jury could assess for themselves any points of similarity (such as facial features, hair, skin color, build, posture, and height) between the various images in evidence and the person present in the court room.  Cf. Commonwealth v. Wardsworth, 482 Mass. 454, 476 (2019), quoting Commonwealth v. Austin, 421 Mass. 357, 366 (1995) ("[the] jury were capable of viewing the videotape and drawing their own conclusions regarding whether the man in the videotape was the defendant without the assistance of [the witness's] testimony").
            In addition, the remarkably detailed and cohesive series of video recordings from pole cameras, MBTA bus cameras, and security cameras detailed the movements of the two men in the Volkswagen on the evening of the shooting and established a timeline of events upon which the jury could reasonably rely.  Those videos, in conjunction with the other evidence, permitted the jury to find the following.  The shooter was seated in the passenger seat of a Volkswagen driven by Carleton, who knew the defendant.  After the shooting, Carleton and the shooter drove directly to a private parking lot next to the defendant's mother's apartment.  The defendant's mother's apartment building was the shooter's intended destination after the shooting, as could be inferred from the fact that he walked directly there after being dropped off by Carleton.  The jury could infer that Carleton and the shooter were familiar with the area around the defendant's mother's apartment and knew about the existence of the private parking lot near the mother's apartment.  They could draw those inferences from the fact that the two men drove there immediately after the shooting and arrived there within a minute, and that the defendant had been photographed in the area two months earlier.  The jury could also reasonably infer that, in the aftermath of the murder, Carleton and the shooter wished to park the car somewhere private, out of view of the public or police, and used the private parking lot to accomplish that end.  Moreover, the jury were entitled to infer that the shooter had a sufficiently strong connection to the defendant's mother's apartment building that he wished to go there directly after the murder.  
            That inference was bolstered by the fact that the shooter was able to -- and did -- retrieve an article of clothing from the mother's building in short order.  The connection between the shooter and the defendant's mother's apartment was further buttressed by the fact that the defendant had frequently been seen in his mother's apartment, the fact that men's sneakers consistent with those worn by the shooter were later located in her apartment, and the fact that the defendant had been photographed in a four-unit residential building "at approximately" 622 Dudley Street.
            There was also ample evidence tying the defendant to the Volkswagen and to its driver, Carleton.  The jury could infer that Carleton knew the defendant from the fact that Carleton had a photograph of the defendant on his (Carleton's) cell phone.  The jury could also infer that the defendant was connected to Carleton's girlfriend, the owner of the Volkswagen, because she arrived at the defendant's mother's apartment when the search warrant was being executed.  In addition, the defendant's DNA was located on a water bottle located in the center console of the Volkswagen, to the left of the passenger seat where the shooter had been seated when he committed the murder.  On several occasions, the defendant had been observed near the mother's residence riding as a passenger in a four-door Volkswagen.  Finally, the video and photographic evidence allowed the jury to conclude that the defendant's fingerprints were lifted from the same spot on the passenger's side door of the Volkswagen where the shooter had placed his left hand when he closed the door behind him.  This is not a case, such as Commonwealth v. Morris, 422 Mass. 254 (1996), upon which the defendant relies, where there was insufficient evidence to establish beyond a reasonable doubt when a fingerprint had been left on a particular surface.  Here, the time-stamped video permitted the jury to find that the shooter left his prints at a particular spot on the passenger's side car door of the Volkswagen less than two minutes after the murder.  See Commonwealth v. Joyner, 467 Mass. 176, 178, 186-187 (2014) (video showing robber touching a cash drawer in same area where defendant's fingerprints were later found, together with additional evidence, sufficient to identify defendant).
            In short, there was ample evidence to permit the jury to find beyond a reasonable doubt that the defendant was the person who shot and killed the victim.  See Commonwealth v. Jones, 477 Mass. 307, 317 (2017) (evidence sufficient to identify where unidentified person was "linked with the defendant in several ways").  
            2.  Commonwealth's opening statement and closing argument.  The defendant argues that portions of the prosecutor's opening statement and closing argument improperly appealed to the jury's emotions, misstated evidence, and reduced the Commonwealth's burden of proof.  We take each claim of error in turn, noting that no objection was made to any aspect of the opening and that only two of the claimed errors in the closing were preserved.  Although the prosecutor went beyond the bounds of permissible argument in one respect during closing argument, that instance does not warrant reversal.[4]
            a.  Opening -- appeal to sympathy.  The purpose of an opening is "to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence."  Commonwealth v. Kapaia, 490 Mass. 787, 794 (2022), quoting Commonwealth v. Fazio, 375 Mass. 451, 454 (1978).  A prosecutor may use "enthusiastic rhetoric" and "excusable hyperbole" but cannot "inflame the jury to evoke an emotional, rather than intellectual response" (citation omitted).  Commonwealth v. Siny Van Tran, 460 Mass. 535, 554 (2011).  Commonwealth v. Lyons, 426 Mass. 466, 472 (1998).  If, as here, "a charge of murder in the first degree is based on the theory of extreme atrocity or cruelty," a prosecutor may "'illustrate the magnitude of the crime' by discussing the details of the victim's death.'"  Commonwealth v. Henley, 488 Mass. 95, 131 (2021), quoting Commonwealth v. Camacho, 472 Mass. 587, 607 (2015).  Because the defendant did not object below, we review to determine whether there was error and, if so, whether the error resulted in a substantial likelihood of a miscarriage of justice.  Kapaia, 490 Mass. at 794.  
            The defendant argues that the prosecutor impermissibly appealed to the jury's sympathy.  Specifically, the defendant challenges the prosecutor's (a) description of a gunshot as "crashing through [the victim's] brain," (b) description of the defendant and Carleton as a "kill team," and (c) description of the murder as a "monstrous crime."  None of these statements exceeded the bounds of permissible rhetoric.  The prosecutor's description of the gunshot was fully supported by the evidence concerning the trajectory of the bullet that passed through the victim's head and the resulting severe injury to his brain, and was also relevant to the issue of extreme atrocity or cruelty.  It did not cross the line between permissible strong rhetoric and improper appeal to emotion.  See Henley, 488 Mass. at 131 (no error where description of victim "gasping for breath" and "[l]ungs filling up with blood as well, bleeding and dying" was based in evidence and relevant to extreme atrocity or cruelty theory).  Similarly, the term "kill team" was an accurate description, albeit a forceful one, of the evidence showing that the driver and the shooter worked together in a coordinated and planned fashion to carry out the killing.  See Commonwealth v. Barbosa, 477 Mass. 658, 669 (2017) (phrase "killing team" "not improper").  Finally, describing the shooting as a "monstrous crime" did not cross the line between fair and improper argument.[5]  Commonwealth v. Alemany, 488 Mass. 499, 512 (2021) (description of alleged crimes as "part of a 'horror story'" not improper).  The prosecutor's description of the crime was "inherent in the odious . . . nature of the crime[]" itself.  Lyons, 426 Mass. at 472, quoting Commonwealth v. Sanchez, 405 Mass. 369, 376 (1989).  
            b.  Closing –- appeal to emotion.  The defendant contends the prosecutor impermissibly appealed to emotion at several points in closing argument.  Specifically, the defendant points to the fact that the prosecutor (1) stated that the victim was "forever thirty-six years old," (2) described the victim's "crumpled up body" as paramedics "fruitless[ly] attempt[ed] to save his life," (3) called the shooting a "horrifying incident," (4) stated that the defendant and Carleton "circled [the victim] like a shark," and (5) contrasted the "successful loving marriage" of the victim and his wife to the "cunning," "malignant," "evil," and "destructive" partnership between the defendant and Carleton that "destroyed everything [the victim and his wife] had."  The defendant objected only to the last two of these aspects of the closing.
            The "prosecutor 'should not play on the sympathy or emotions of the jury,' but is entitled to 'tell the jury something of the person whose life [has] been lost in order to humanize the proceedings.'"  Commonwealth v. Chukwuezi, 475 Mass. 597, 609 (2016), quoting Commonwealth v. Rodriguez, 437 Mass. 554, 566 (2002).  There is a difference "between a dramatic description" of events and "an argument designed to appeal to the jury's emotions."  Commonwealth v. Young, 461 Mass. 198, 204 (2012), quoting Commonwealth v. Vuthy Seng, 436 Mass. 537, 555 (2002), cert. denied, 537 U.S. 942, S.C., 456 Mass. 490 (2010).  Where, as here, a murder charge is based on a theory of extreme atrocity or cruelty, "enthusiastic rhetoric, strong advocacy, and excusable hyperbole" are "not grounds for reversal," Young, 461 Mass. at 205, quoting Commonwealth v. Costa, 414 Mass. 618, 629 (1993), because the task of the jury in such cases is to "determine whether the killing merits that description," Young, 461 Mass. at 205.  "Dramatic description from the prosecutor is more likely in such cases given the nature of the charge . . . ."  Id.  
            While the single brief reference that the defendant would be "forever thirty-six year old" may have garnered some sympathy, it was grounded in the evidence and was permissibly "presented as part of a broader, humanizing description of the victim's life" at the moment of the shooting.  Chukwuezi, 475 Mass. at 610 & n.20 (prosecutor described victim as "[f]orever fifteen years old").  See Alemany, 488 Mass. at 511 (prosecutor referred to victim's "forever age").  The statements referring to the victim's crumpled up body and the fruitless efforts of the emergency medical technicians were solidly grounded in the evidence, and were not inflammatory.  See Chukwuezi, 475 Mass. at 609 (prosecutor's reference to "carnage" that defendant "inflicted on [victim's] body" was not error).  And the statement describing as "horrifying" the premeditated shooting of a man while he watched fireworks with his wife seated next to him and his small children played across the street added no discernible quantum of emotion to what was inherent in the event.  These three unobjected-to statements were within the bounds of permissible argument.
            The defendant objected to the prosecutor's statement that the defendant and Carleton "circled [the victim] like a shark."  We do not condone the use of language suggesting that a defendant is inhuman or akin to an animal.  See Commonwealth v. Sheehan, 435 Mass. 183, 190-191 (2001) (labeling defendant "predator" who "picked the weak chick to prey upon" was unwarranted); Commonwealth v. Collins, 374 Mass. 596, 601 (1978) (prosecutor's "use of the term 'animal,' which the jury might well have inferred was a reference to the defendant, was clearly an impermissible excess").  That said, the common idiom of "sharks circling" refers to people waiting to take advantage of a situation (usually in a financial context), and we think that the jury would have understood the phrase as a description of the defendant's and Carleton's conduct rather than as a dehumanization of them.  See Commonwealth v. Kozec, 399 Mass. 514, 517 (1987) ("A certain measure of jury sophistication in sorting out excessive claims on both sides fairly may be assumed").  This is especially the case where the common understanding of the idiom matched the evidence of the defendant's and Carleton's conduct leading up to the shooting, circling the area by car.
            The prosecutor should not, however, have built his closing around a contrast between the loving and successful partnership of the victim and his wife and the "cunning," "malignant," "evil," and "destructive" partnership between the defendant and Carleton.  Manichaean constructs of this sort are to be avoided because it is "not relevant that the victim is a 'good' person and that the defendant is a 'bad' person."  Commonwealth v. Simpson, 434 Mass. 570, 584 (2001) (improper for prosecutor to characterize victim as "family man" and defendant as having "complete disregard for human life").  Nonetheless, we discern no prejudice warranting reversal.  The statements did not bear on the central issue with respect to the defendant, which was whether he was the shooter, see Kapaia, 490 Mass. at 797-798 (remark "did not go to the heart of the case or strike impermissibly at the defendant's defense that he was not the shooter"), and the Commonwealth's evidence of identification was very strong.  Additionally, the judge instructed the jury multiple times that opening and closing statements are not evidence and that they were not to decide the case based on sympathy.  "Absent an 'overwhelming probability' that the jury will be unable to follow the court's instructions,' and 'a strong likelihood that the effect of the [statements] would be 'devastating' to the defendant," we presume the judge's instructions are sufficient."  Commonwealth v. Walters, 485 Mass. 271, 294 (2020), quoting Commonwealth v. Crayton, 470 Mass. 228, 252 (2014).
            c.  Misstatements of evidence.  A prosecutor should not misstate the evidence or refer to facts not in evidence.  Kozec, 399 Mass. at 516.  Here, the defendant contends the prosecutor did so in two respects.  First, he argues that the videotape showing the shooter exiting the car was not sufficiently clear to permit the prosecutor to claim that it showed he had dreadlocks.  We have carefully reviewed the videotape ourselves, and although it is not of sufficient resolution to make out fine details, it does permit an inference that the shooter's hair was long and styled in dreadlocks or something akin to them.  The prosecutor could permissibly argue that the video showed that the shooter had dreadlocks.[6]  See Commonwealth v. Lacrosse, 494 Mass. 475, 503 (2024).  Cf. Commonwealth v. Davis, 487 Mass. 448, 468 n.25, 469 (2021), S.C., 491 Mass. 1011 (2023), (no error where prosecutor stated in closing that defendant's appearance was consistent with shooter's appearance in grainy video, which showed man with braids or dreadlocks, and did not ask jury to identify defendant as person in video).  Moreover, the jury had the video before them and could ultimately decide what it showed with respect to the shooter's hairstyle.  See Lacrosse, 494 Mass. at 503 (jury are ultimately to decide what is depicted in video).
            Second, although the evidence showed that Carleton's cell phone had a photograph of the defendant stored on it, the defendant is correct that there was no direct evidence that Carleton was the person who "took" the photograph, as the prosecutor stated in closing.  It does not necessarily follow, however, that the prosecutor misstated the evidence.  A prosecutor's argument may be based not only on the evidence, but also on the fair inferences to be drawn from it.  Commonwealth v. Rutherford, 476 Mass. 639, 643 (2017).  And those inferences "need not be necessary and inescapable, only reasonable and possible."  Commonwealth v. Robinson, 493 Mass. 775, 788 (2024), quoting Commonwealth v. Goddard, 476 Mass. 443, 449 (2017).  We need not decide whether the cell phone's metadata was sufficient to support an inference that the photograph was taken with that particular cell phone, or by whom.  Particularly in light of the other evidence connecting Carleton and the defendant, any error did not rise to the level of a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Santana, 477 Mass. 610, 627 (2017).
            d.  Burden-shifting.  The defendant contends that the prosecutor impermissibly shifted the burden to him by arguing:
"Nor am I going to go down every rabbit hole that [defense counsel] attempted to drag you down in their closing.  I understand [defense counsel] are outstanding lawyers.  I told you that at the beginning.  They are compelling, but when you look at the evidence and not engage in what they are asking you to do, which is to engage in speculation. . . .  [I]n their closings, [defense counsel] throw all of this speculation like spaghetti against a wall because they don't want you to focus on that evidence."
The defendant contends that this argument shifted the burden to him "by telling the jury that he had to show more than speculation or 'spaghetti against a wall'" or going down a rabbit hole.[7]  Taken in context, this is not a fair reading of this portion of the prosecutor's closing argument.  The prosecutor's statement did not comment on the defendant's failure to present evidence or disprove the Commonwealth's evidence.  See Commonwealth v. Amirault, 404 Mass. 221, 240 (1989).  Instead, the argument responded to defense counsels' closings, which asked the jury to consider alternate suspects and theories.  A prosecutor is "permitted to comment on the defense strategy and tactics" and argue "that the strategy was intended to confuse."  Commonwealth v. Scesny, 472 Mass. 185, 202 (2015).  See Commonwealth v. Raposa, 440 Mass. 684, 697 (2004) (nothing improper in prosecutor's remark "characteriz[ing] defense counsel as an attorney able to 'spin gold from straw'"); Commonwealth v. Maldonado, 429 Mass. 502, 508-509 & n.4 (1999) (prosecutor's description of defense counsel's argument as "riddled with smoke screens" and "designed to try to deter you from your mission of finding the truth" was proper and did not create substantial likelihood of miscarriage of justice).  
            3.  Motion to suppress.  The defendant moved to suppress evidence recovered as a result of the search of his mother's apartment, arguing that the affidavit supporting the warrant application did not establish probable cause to search apartment no. 1 of 626 Dudley Street.  "[O]ur inquiry as to the sufficiency of the search warrant application always begins and ends with the 'four corners of the affidavit.'"  Commonwealth v. Mora, 477 Mass. 399, 400 (2017), quoting Commonwealth v. O'Day, 440 Mass. 296, 297 (2003). 
            Here, the affidavit established that a Black man riding as a passenger in a Volkswagen with distinctive markings shot and killed the victim.  The car was driven by another Black man, identified as Carleton, whose fingerprints were located on the gearstick and on the driver's side exterior door handle.  Immediately before the shooting, the shooter was wearing a white shirt with what appeared to be a yellow marking across the chest area.  After the shooting, the Volkswagen was driven directly to a parking lot behind 630 Dudley Street, where the male passenger exited.  This man was wearing a white shirt and appeared to have long hair, "possibly dreads."  The defendant is a five foot, seven inch Black man with braids or dreads, and who weighs 165 pounds.  The man then walked directly to a four-unit residential building located at 626 Dudley Street, which he entered.  When the man emerged after a period of time, he was wearing a white hat.  The man walked across the street to Dudley park.  MBTA bus video showed the man later returning from the park to 626 Dudley Street wearing a white shirt with a yellow marking on it "consistent with that of the passenger (shooter) in the suspect motor vehicle."  The building manager told police that a resident of apartment no. 1 was a frequent passenger in the Volkswagen.  That resident was the son of Sara Phillips.  Sara Phillips is the defendant's mother.  The Registry of Motor Vehicles listed 626 Dudley Street, no. 1 as the defendant's residence, and a probation officer confirmed that address.  The defendant had also previously given that address as his residence to police at various times.  The defendant's fingerprint was on the exterior passenger's side door handle of the Volkswagen.
            In order to search the mother's apartment, the application needed to supply "a substantial basis for concluding that evidence connected to the crime will be found on the specified premises."  Commonwealth v. Perkins, 478 Mass. 97, 104 (2017), quoting Commonwealth v. Tapia, 463 Mass. 721, 726 (2012).  "The nexus between the crime alleged and the place to be searched 'need not be based on direct observation.'"  Perkins, 478 Mass. at 104, quoting Commonwealth v. Matias, 440 Mass. 787, 794 (2004).  Rather, "[a]ll reasonable inferences which may be drawn from the information in the [search warrant application] may also be considered as to whether probable cause has been established."  Commonwealth v. Holley, 478 Mass. 508, 521-522 (2017), quoting Commonwealth v. Donahue, 430 Mass. 710, 712 (2000).  The defendant argues that because 626 Dudley Street is a multi-unit building, there was insufficient basis to infer that the shooter went into the defendant's mother's apartment as opposed to somewhere else in the building.  That argument fails given the ample information in the affidavit tying the shooter to 626 Dudley Street, tying the defendant to the Volkswagen, and tying the defendant to his mother's apartment.  
            4.  Instruction on extreme atrocity or cruelty.  Even though the defendant's trial occurred after Commonwealth v. Castillo, 485 Mass. 852 (2020), the judge gave the pre-Castillo model instruction concerning extreme atrocity or cruelty.[8]  The error was not objected to at trial, nor did the defendant take any action once the judge notified the parties of the error one year after trial.  In the circumstances, we review only to determine whether giving the outdated instruction resulted in a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Miranda, 492 Mass. 301, 318 (2023) (standard of review for instructional error in case of murder in first degree).  Here, it did not because the defendant was convicted not only on a theory of extreme atrocity or cruelty, but also on the theory of deliberate premeditation.  Accordingly, regardless of the instructional error, the murder verdict on the alternate theory of conviction is unaffected.[9]  See Commonwealth v. Kosilek, 423 Mass. 449, 456 (1996) ("highly unlikely that defendant was prejudiced by" erroneous extreme atrocity or cruelty instruction where jury also "found the defendant guilty on the theory of premeditated and deliberate murder").  See also Commonwealth v. Nolin, 448 Mass. 207, 220 (2007) ("If a jury return a guilty verdict based on two theories [of murder in the first degree], the verdict will remain undisturbed even if only one theory is sustained on appeal").
            5.  Failure to instruct on firearm licensure.  The jury were not instructed that the Commonwealth bears the burden to prove that the defendant did not possess a firearms license in order to find the defendant guilty of unlawful possession of a firearm in violation of G. L. c. 269, § 10 (a).  Nor did the Commonwealth introduce evidence of the lack of licensure.  At the time of the defendant's conviction, lack of a firearms license was "not an element of the offense the Commonwealth [was] required to prove."  Commonwealth v. Guardado, 491 Mass. 666, 668 (Guardado I), S.C., 493 Mass. 1, 12 (2023) (Guardado II), cert. denied, 144 S. Ct. 2683 (2024).  Following the United States Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022) (Bruen), however, we determined that the Commonwealth bore the burden to prove as part of its affirmative case that the defendant did not have a valid firearms license.  Guardado I, 491 Mass. at 668.  "Because Bruen was decided after the defendant's trial but while the case was pending on appeal, he is entitled to the benefit of the new rule; that is, the right to have the Commonwealth prove that he lacked a license."  Guardado II, 493 Mass. at 12.  We therefore vacate the defendant's conviction of unlawful possession of a firearm and remand for a new trial on that charge.  See id. 
            6.  Review Under G. L. c. 278, § 33E.  Finally, having considered the defendant's arguments and after our own independent and thorough review of the record, we discern no reason to exercise our extraordinary power pursuant to G. L. c. 278, § 33E, to vacate his murder conviction or to reduce the verdict in the interest of justice.
            Conclusion.  The defendant's conviction of murder in the first degree is affirmed.  We vacate the defendant's conviction of unlawful possession of a firearm and remand for a new trial on that charge.
So ordered.
 
footnotes

 
            [1] Carleton was tried with the defendant, and the jury convicted him of murder in the first degree, G. L. c. 265, § 1, and of possessing a firearm without a license, G. L. c. 269, § 10 (a).  Carleton's appeal is currently pending before this court.
            [2] Emergency medical technicians arrived within minutes of the shooting; they found the victim pulseless and apneic, and with dilated pupils; the victim was deemed "nonviable" almost immediately.
            [3] Forensic evidence also tied Carleton to the Volkswagen.  His fingerprints and palm print were found on the exterior of the vehicle's driver's side door and gearshift.  In addition, paperwork belonging to Carleton was found in the car.
            [4] The defendant also argues that counsel's failure to object to the errors he raises for the first time on appeal amounts to ineffective assistance of counsel.  But the unobjected-to statements did not cross the line of impermissible argument, and thus, counsel's performance was not ineffective when she failed to object to them.  See Commonwealth v. Vargas, 475 Mass. 338, 361 (2016) (where no objection, we review "to determine if any error in failing to object would have created a substantial likelihood of a miscarriage of justice").
            [5] In fact, defense counsel in her own closing acknowledged that "this was a monstrous calculated killing."  
            [6] The prosecutor's reference to dreadlocks, which was made in the context of establishing identity, was not an impermissible argument based on race.  Cf. Commonwealth v. Tate, 486 Mass. 663, 674 (2021) (racist remarks in closing would be "grossly improper").
            [7] Although defense counsel objected to this portion of the prosecutor's closing, she did not do so on the ground that it shifted the burden to the defendant.  Rather, defense counsel objected on the ground that the argument cast an impermissible aspersion on defense counsel.  The defendant does not pursue this argument on appeal.
            [8] Specifically, the judge instructed that the jury could "make a finding of extreme atrocity or cruelty . . . based on one or more of [seven] factors," which included "the consciousness and degree of suffering of the deceased."  Castillo, however, rejected that formulation, reasoning that if "consciousness and degree of suffering of the victim" were "allowed to stand alone as sufficient to support a finding of extreme atrocity or cruelty," it would "permit[] a defendant to be found guilty of murder in the first degree in some circumstances even if his conduct were not extremely atrocious or cruel."  Castillo, 485 Mass. at 863.
            [9] The defendant's argument that trial counsel was ineffective for failing to object to the erroneous instruction fails for the same reason.  See Commonwealth v. Gonzalez, 465 Mass. 672, 688 (2013) ("Because the defendant's claims of error concerning the jury instructions do not create a substantial likelihood of a miscarriage of justice, these same claims cannot be the basis for a determination of ineffective assistance of trial counsel").